**Edward C. REA and 22 Ford, Inc.,
a corporation**

v.

**FORD MOTOR COMPANY.**
**Civ. A. No. 67–286.**

United States District Court,
W. D. Pennsylvania.

Dec. 26, 1972.

As Amended Jan. 30, 1973.

See also D.C., 337 F.Supp. 950.

Robert A. Jarvis, Robert Wayman, Thomas Kerr, Pittsburgh, Pa., for plaintiffs.

Frank L. Seamens and John Morgan, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER: DEFENDANT'S POST-TRIAL MOTIONS

KNOX, District Judge.

This complex and protracted piece of litigation has been pending since March 6, 1967, when plaintiffs, a Corporate Ford Dealer and its major stockholder, filed a complaint against defendant, Ford Motor Company, setting forth seven causes of action:

(1) Breach of contract as to purchase of real estate and erection of a dealership facility in Monroeville, Allegheny County, Pennsylvania.

(2) An action for specific performance to require conveyance of the property mentioned in the first cause of action.

(3) An action for violation of the Robinson-Patman Act, 15 U.S.C. § 13(e).

(4) An action for violation of the Automobile Dealers Act, 15 U.S.C. § 1221 et seq.

(5) An action based upon alleged monopolistic practices and restraints of trade under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

(6) An action also based upon Sherman Sections 1 and 2, resulting from a requirement that plaintiffs not deal in vehicles, parts and equipment of a competitor of defendant, viz: General Motors Corporation.

(7) An action for an order to the Prothonotary of Allegheny County

to index a lis pendens during the pendency of the second cause of action for specific performance.

There ensued lengthy discovery proceedings and numerous motions and arguments with respect to these suits before two other judges of this court to whom the case was assigned before final assignment to the undersigned. There were also various proceedings in the United States District Court for the Eastern District of Michigan resulting from attempts by plaintiffs to take the depositions of Lee A. Iacocca, President of defendant, and other officials of the Ford Motor Company at its principal offices in Dearborn, Michigan, which proceedings as well as other discovery proceedings were vigorously resisted by the defendant.

After more than three years of discovery, defendant filed a motion for partial summary judgment with respect to the second and seventh causes of action and this court, by opinion and order dated May 5, 1971, (Rea v. Ford Motor Co., 326 F.Supp. 627 (W.D.Pa.1971), granted this motion for partial summary judgment with respect to these causes of action holding there was no sufficient memorandum in writing to satisfy the Pennsylvania Statute of Frauds (33 Purdon's Pa.Stat. § 1 et seq.) and also with respect to certain letters and other writings upon which plaintiff relied the authority of the person signing the same was not expressed in writing as also required by the Statute of Frauds. The Court of Appeals for the Third Circuit, by order dated September 15, 1972, dismissed an appeal from this order since, in the light of other developments in the case, it appeared that the appeal was improvidently certified. The court pointed out that subsequent to the lodging of the appeal, trial of the remainder of the case had been held at which plaintiffs (appellants) had pursued an alternative remedy, viz: a claim for damages for breach of oral contract for the sale of real estate. Since post-trial motions were pending with respect to the jury's verdict hereinafter referred to

awarding damages for breach of said oral contract, the appeal was dismissed with leave to the appellants to file a fresh appeal covering the subject matter in question, after the effective date of a final judgment in the District Court upon the remaining claims.

██ We adhere to our former decision on these matters reported in 326 F.Supp. 627 and hold that regardless of the finding of the jury that there was an oral contract for conveyance of real estate for breach of which damages were awarded, there is still insufficient evidence in writing of the existence and terms of such contract to justify an order of specific performance; that to allow specific performance under the second and seventh causes of action would be prohibited by the Pennsylvania Statute of Frauds, supra; that there is insufficient evidence of a written memorandum with respect to said contract; and the authority of persons to sign certain documents and letters in behalf of Ford Motor Company was not expressed in writing as required by the statute. We will deal with the question as to whether there was sufficient evidence to go to the jury to justify their finding of an oral contract to convey real estate and their award of damages for breach thereof later in this opinion.

Meanwhile, the remainder of the case was proceeding to trial. The following isues were left:

(1) Breach of oral contract to convey real estate.

(2) Violation of the Robinson-Patman Act.

(3) Violation of the Automobile Dealers Act.

(4) Violation of Section 1 of the Sherman Act.

(5) Violation of Section 2 of the Sherman Act.

██ After further skirmishing with motions with respect to the pretrial narrative statements and motions for summary judgment and a lengthy pretrial conference, the case was fixed for trial

in February of 1972. The trial was delayed by an attempt on the part of the plaintiffs to require the trial judge to disqualify himself which the trial judge refused to do. See Rea v. Ford Motor Co., 337 F.Supp. 950 (W.D.Pa.1972). The case proceeded to trial on April 17, 1972. The trial consumed five and one-half weeks, with over 5100 pages of transcript. At the conclusion of the evidence, the court directed a verdict as to Section 13(e) of the Robinson-Patman Act (15 U.S.C. § 13(e)), holding (N.T. 5,008) that alleged discrimination as shown by plaintiff's evidence in favor of other dealers by offering them favorable real estate transactions and favorable terms of financing did not constitute a violation of the Robinson-Patman Act which is concerned solely with price discrimination in the sale of commodities. See Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town & Country Shopping Center, Inc., 219 F.Supp. 400 (W.D.Pa.1963); Texas Gulf Sulphur Co. v. J. R. Simplot Co., 418 F.2d 793 (9th Cir. 1969); I. M. Skinner v. United States Steel Corp., 233 F.2d 762 (5th Cir. 1956).

The court likewise held that there was insufficient evidence of monopolization under Section 2 of the Sherman Act but permitted the case to go to the jury to determine if there was an attempt to monopolize under Section 2.

The jury was instructed by the court to return a special verdict which they did after lengthy deliberations, the material portions of which are set forth in Appendix I to this opinion.

The court thereupon entered judgments in accordance with the terms of the special verdict, trebling the damages found by the jury in answer to Question No. 9 in the amount of $1,750,000.00, pursuant to the provisions of 15 U.S.C. § 15, whereby they were increased to $5,250,000 thus resulting in a total award against defendant of $5,629,683. The defendants have now filed post-trial motions as follows:

(1) Motion for Judgment in Accordance with Motions for Directed Verdict with respect to all causes of action submitted to the jury (hereinafter referred to as Motion for Judgment NOV).

(2) In the Alternative, a Motion for New Trial alleging 35 reasons therefor.

(3) Motion to Amend the Judgment claiming that judgment had been entered in favor of the wrong persons.

We have received voluminous briefs from the parties (approximately 350 pages from the defendant and approximately 125 from the plaintiff) and have heard extensive oral arguments with respect to the same and will dispose of these motions in the following opinion.

In approaching this task, we bear in mind the elementary rule that a verdict winner is entitled to the benefit of all evidence in his favor regardless of who produced such evidence and all inferences deducible therefrom: Bruce Lincoln-Mercury v. Universal CIT Credit Corp., 325 F.2d 2 (3d Cir. 1963); Globe Motors v. Studebaker-Packard Corp., 328 F.2d 645 (3d Cir. 1964); Walsh v. Miehle-Goss-Dexter, Inc. v. Stern, 378 F.2d 409 (3d Cir. 1966); United States v. Evers, 448 F.2d 863 (3d Cir. 1971); Neville Chemical Co. v. Union Carbide, 422 F.2d 1205 (3d Cir. 1970).

We will deal with the motions with respect to each cause of action in the order in which they were presented.

### (I) *Breach of Contract for Conveyance of Real Estate.*

Plaintiff's first cause of action alleges a contract to convey real estate generally known as the Balison tract in Monroeville, Allegheny County, Pennsylvania and asks for damages for the breach of the same including loss of bargain. As previously discussed, partial summary judgment was entered for defendant with respect to the second and seventh causes of action seeking specific performance of this contract and lis pendens.

We adhere to what was said with respect to these matters in the opinion reported in Rea v. Ford Motor Co., 326 F. Supp. 627 (D.C.1971). Inasmuch as our Court of Appeals has held that the order previously entered was interlocutory and not subject to review and to protect plaintiff's rights we will again enter summary judgment in favor of defendant on the second and seventh causes of action. We now turn to questions now raised as to the first cause of action.

(a) *The existence of an oral contract.*

■■ At the trial of this case, plaintiffs presented evidence as to the first cause of action and claimed damages for breach of an oral contract to convey real estate. This was proper under Pennsylvania law since the Statute of Frauds applies only to an action for specific performance and not to a suit for damages for breach of an oral contract respecting real estate. Polka v. May, 383 Pa. 80, 118 A.2d 154 (1955); see also Thompson v. Sheplar, 72 Pa. 160; McDowell v. Oyer, 21 Pa. 417. In such case, however, the vendee's right to damages is restricted to monies laid out and expenses incurred on the faith of the oral contract to convey: he cannot secure damages for the loss of his bargain, i. e., the difference between the contract price and the actual market price of the real estate or any loss of profits from the transaction or loss of any appreciation in value of the real estate.

Plaintiff Rea recognized this rule and submitted evidence as to his expenditures on the faith of the contract, viz: $1.00 in option money which he says he paid to bind the bargain during negotiations plus expenses incurred by him in connection with the construction of the dealership facility on the property. During the course of construction, it was necessary to install hoists for servicing vehicles, conduits for electric cables and certain partitions. These were not in the original plans and the Ford Motor Company which paid the other costs of construction of the facility refused to pay for them and hence plaintiff paid the contractor for these items totalling $29,683. Payment was actually made by plaintiff Rea's controlled corporation, 22 Ford Inc., (as to which more hereafter) although it is clear that the original contract as found by the jury was between the individual plaintiff Rea and defendant Ford.

In our opinion at 326 F.Supp. 627 at 631, it was noted there had been a discussion between plaintiff Rea and the representatives of Ford Motor Company looking to Rea opening a Ford dealership at this new point for Ford sales in Monroeville. The discussions concerned a so-called direct-lease transaction whereby Rea or a corporation formed by him would acquire title to the land and then lease it under a long-term lease to Ford Motor Company whose payments of rents would be used to finance the transaction. Ford would then lease the facility back to the dealership. With Ford's name on the underlying lease which would be assigned to the financier, this would make a very desirable transaction. The evidence indicates that at some time this transaction was changed because the seller, which was a corporation, wanted to sell stock and not assets, and Ford could not see any reason for paying financing charges to an outside party when it had ample resources to purchase this land and put up the buildings out of its own funds. The transaction was therefore modified so that Ford acquired the stock in the seller corporation and then dissolved this entity thus obtaining title to the real estate. At this time there were indications that Ford was willing to enter into some arrangement known as the "buyout plan" whereby it would sell the property to Rea over a term of years. Some of the elements of this plan were embodied in the so called option which Ford sent to Rea on December 29, 1966, and which Rea refused to sign claiming it was not in accordance with the original understanding between the parties and that it gave him only an illusion of an interest in the property since Ford could reacquire it at any time at cost if Rea ever ceased to be a Ford dealer.

In our opinion at 326 F.Supp. 627 at 631, we indicated that all the documents showed was some evidence of negotiations looking eventually to working out an arrangement between Ford and plaintiff. When the case went to trial, we were not limited to written documents and communications but the entire nature of the understanding between Rea and Ford was introduced in evidence through the testimony of plaintiff Rea and his corroborating witnesses who were aware of the elements of the transaction. This evidence showed that in 1963 Rea, who was known as a highly successful Oldsmobile dealer in nearby Wilkinsburg, was approached as a dealer prospect by various representatives of Ford with a view to opening up a new Ford dealership in Monroeville. Discussions were had not only with representatives from the Pittsburgh District Office of Ford but also representatives from defendant's general offices in Dearborn, Michigan. A transaction was worked out according to plaintiffs' testimony whereby Rea was to enter into the so-called direct-lease deal for the Monroeville property. It appears that as part of the transaction in order to raise capital he at that time planned to give up his Oldsmobile franchise. It was stated to him that the transaction would be similar to that of the Rossi-Downtown Ford direct-lease in Detroit, the Chase-Morsey transaction for Paradise Ford in Scottsdale, Arizona, and other direct-lease dealer transactions which were mentioned in the testimony to show the manner in which the transaction was to be accomplished. The mortgage to the financier was to be amortized over a twenty-year period to cover the cost of land and improvements and the property then was to be sublet by Ford back to Rea's dealership. The rental factor was to be at the rate of 7½% of the cost of the land and facilities, plus amounts equal to taxes, insurance and maintenance. This would amortize the mortgage over a twenty-year period so that at the end of this time Rea would own the property free of encumbrances. Various communications in defendant's files confirmed that such a transaction was the plan.

The case was submitted to the jury to determine first whether there was any binding contract at all to which the jury answered "yes" and secondly whether the terms were those of the so-called direct-lease plan (Question 2(a) or the so-called buy-out plan (Question 2(b)). The jury answered that the contract consisted of the so-called direct-lease plan (Interrogatory 2a) and answered Interrogatory No. 3 that there had been a breach of contract by Ford and Interrogatory No. 4 awarded damages in the amount of $29,683 to plaintiff Rea.

There was ample evidence to support the jury's verdict with respect to the making of this contract notwithstanding defendant's contention that the evidence was too vague and indefinite to justify any finding for plaintiff.

It is true that the burden is upon the plaintiff to establish the terms of the contract on which he bases his claim: Kassab v. Ragnar-Benson, Inc., 254 F. Supp. 830 (W.D.Pa.1966). This was a non-jury case in which the judge held that the terms of an employment contract were too vague to be enforceable. The basic Pennsylvania case [1] is Beachler v. Mellon-Stuart Co., 354 Pa. 341, 47 A.2d 147 (1946) which, like this case, was tried by a jury and the court held that there was insufficient evidence to support the jury's verdict that there was a binding and enforceable contract. The court held that there was no meeting of the minds as to any terms and the terms were most inadequate and indefinite and could not in any sense constitute a contract. In the instant case, the jury was carefully instructed on this and as to the necessity for finding a meeting of the minds. See Tr. 5070 et seq.

Beachler, supra, teaches us that in such a case to determine if there

[1]. Since the alleged contract was made in Pennsylvania and concerned Pennsylvania real estate, we apply Pennsylvania law to this portion of the case.

was sufficient evidence to go to the jury, we must look for the following:

(1) Was there a meeting of the minds?

(2) When does the contract commence?

(3) For what period is it to run?

(4) What was the price to be paid?

(5) What were the terms of payment?

There is no question in a disputed issue as to whether a contract existed at all or where it is partly oral and partly written the case must go to the jury. Agger v. Frank Donatelli & Co., Inc., 171 Pa.Super. 631, 91 A.2d 303 (1952).

■■■■ Applying the tests in Beachler to this case, we find that there was sufficient oral and written testimony to enable the jury to arrive at the conclusions which it did. There was evidence as to a meeting of the minds on the terms between Rea and the representatives of Ford Motor Company. The contract was to commence when the dealership facility to be erected on the land had been completed. It was to run for a period of twenty years. The amount to be paid was to be the total cost of the land and buildings which could easily be ascertained when the structure was completed. The terms of payment were an annual payment of 7½% of cost plus taxes, insurance and maintenance. Other details of the transaction were as set forth in the arrangements made with Rossi-Downtown Ford and Chase-Morsey Dealership in Scottsdale. This is a typical case for application of the maxim *id certum est quod certum reddi potest* (that is certain which can be made certain). When all the terms of a transaction have been agreed upon and all that remains is putting it in the form of a final formal writing, this will not prevent the Pennsylvania courts from treating it as an enforceable agreement and not mere negotiations. Moudy v. W. Va. Pulp & Paper Co., 385 Pa. 39, 121 A.2d 881 (1956); Emerman v. Baldwin, 186 Pa.Super. 561, 142 A.2d 440 (1958).

The foregoing discussion also disposes of defendant's reason (aa) of its motion for new trial.

(b) *The Parole Evidence Rule.*

■■■■ Defendant next claims that the parol evidence rule was violated by allowing testimony as to the existence of an oral contract and therefore the matter was improperly sent to the jury. The court at page 4881 refused to instruct on the parol evidence rule for the reason that there was nothing in the contracts with respect to purchase of the property. The two written instruments to which defendant is apparently referring as the basis for applying the parol evidence rule to this case are (1) the dealership agreement (plaintiff's exhibit 118) and (2) the lease agreement covering the facility (plaintiff's exhibit 65). Neither one of these agreements says anything about plaintiff's right to purchase the property. The dealership agreement is the standard Ford Dealer's agreement and has nothing whatsoever to do with the facility to be occupied by the dealer. The lease agreement is also a standard lease from Ford Motor Company to a dealer for certain facilities for a dealership and it likewise says nothing about the purchase of the premises by the dealer. As the court pointed out at page 4881, if the lease agreement, as many leases do, had an option to purchase clause in it, the plaintiff would be bound by it and we would not permit the introduction of any parol testimony to vary its terms, but it does not.

■■■■ While Pennsylvania is very strict in applying its parol evidence rule and has been since the landmark case of Gianni v. Russell & Co., 281 Pa. 320, 126 A. 791 (1924) nevertheless this rule only forbids oral testimony on a *subject covered by the contract.* As a matter of fact, Gianni says:

"In cases of this kind, where the cause of action rests entirely on an alleged oral understanding *concerning a subject which is dealt with in a written contract* it is presumed that the writing was intended to set forth the

entire agreement as to that particular subject."

Further cases dealing with the subject hold that the question is whether or not a matter is dealt with at all in the writing. Bardwell v. Willis Co., 375 Pa. 503, 100 A.2d 102 (1953); Grubb v. Rockey, 366 Pa. 592, 79 A.2d 255 (1951); Tara Ann Inc. v. Sun Ray Drug Co., 383 Pa. 521, 119 A.2d 91 (1956).

██ For these reasons, the court refused to apply the parol evidence rule and let the question of an oral contract go to the jury.

(c) *Apparent Authority of Ford Representatives.*

Defendant next contends that the Ford representatives who negotiated the transaction acted without authority, and seeks to rely upon certain evidence by Mr. Iacocca and others, that these representatives could only recommend real estate transactions to the home office and had no authority to bind the company.

██ The negotiations with respect to the so-called direct-lease transaction, which was found by the jury to be a binding contract, were conducted largely by Mr. McClanathan, Pittsburgh District Sales Manager, and Mr. Chase, Market Representation Coordinator of Ford, who was sent out from the home office in connection with the transaction. Plaintiff offered the depositions of these persons and in these depositions were various statements indicating they did have authority to enter into the arrangement with Mr. Rea. It is elementary, of course, that an agent's judicial statements as to his authority are admissible to show the same, but not his extra-judicial hearsay statements.

██ The evidence indicates that Mr. McClanathan, District Sales Manager, was authorized and empowered to prospect for new Ford dealers and had conducted negotiations with Mr. Rea and that Mr. Chase was authorized by the market representation department to deal with Rea concerning the acquisition of a suitable site for the new dealership

to be set up in Monroeville. The Ford General Sales Bulletin No. 5512 (Exhibit Px 82) set up authority of the market representation manager to enter into negotiations concerning dealership sites and Mr. Chase, Market Representation Coordinator, was sent to Pittsburgh for this purpose.

In addition to the above, we have the fact that certain letters from the Ford files which were offered in evidence by plaintiff indicated that Ford recognized it had made certain arrangements with Mr. Rea with respect to the facility in question and owed him some duty to honor them.

The court let the jury determine whether the plaintiff Rea was justified in relying on the apparent authority of the Ford representatives, this being a matter to be determined in deciding whether there was a valid contract. (See Tr. 5065, 5066). The jury found against Ford on this score and it is the opinion of the court there was sufficient evidence for them so to find.

In view of the fact that the construction of an operation of this facility at this new point by Rea was intimately connected with his opening up the new Ford Dealership, negotiations for which were in charge of the Pittsburgh District Sales Manager, and in view of the fact that when matters reached a critical point, Mr. Chase, the Market Representation Coordinator, was specifically sent out from Dearborn to handle the transaction, would be enough for Mr. Rea to conclude that they had apparent authority to act. It would not be appropriate for him to meet Mr. Chase at the airport and demand that he produce a resolution from the Ford Motor Company Board of Directors before he discussed the matter further with him.

██ The court concludes that under Pennsylvania law Mr. Rea was entitled to rely on this apparent authority despite the alleged secret restrictions which Ford claimed it had imposed upon these agents. See Revere Press, Inc. v. Blumberg, 431 Pa. 370, 246 A.2d 407. See

also Restatement of Agency 2d, Sections 8, 27 and 50.[2]

Our Court of Appeals has recently discussed apparent authority in Reading Co. v. Dredge Delaware Valley, 468 F.2d 1161 (3d Cir. 1972), as follows:

> "Apparent authority is the power to bind the principal where the principal has not actually granted authority but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if the principal knowingly permits the agent to exercise such power: Revere Press, Inc. v. Blumberg, 431 Pa. 370, 246 A.2d 407 (1968)."
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "It is sufficient to create apparent authority if the principal should realize that his conduct is likely to create a belief that the agent is authorized to act for him. Restatement of Agency, 2d, § 27. Comment a, p. 104. See Revere Press, Inc. v. .Blumberg, et al, 431 Pa. 370, 246 A.2d 407 (1968)."

There is no evidence that Mr. Rea was aware of any limitations on the authority of the Ford representatives if they existed. For this reason, we hold that the question of apparent authority was for the jury to decide.

(d) *Damages—Expenditures by 22 Ford, Inc.*

 The contract with respect to the real estate was originally entered into between the individual plaintiff, Edward C. Rea, and the Ford Motor Company. The land was to have been bought and the facility constructed by Rea and then leased to Ford Motor Company and subleased back to the Dealership to be formed by Rea which is now 22 Ford, Inc. one of the two plaintiffs in this case. As previously noted, under Pennsylvania law, the purchaser under an oral contract for sale of real estate can recover any such expenditures made by him upon the faith of the contract. Therefore, the jury was told that Rea was entitled to recover any such expenditures made by him if they found the contract existed (Tr. 2154) but was further told they could not include expenditures for movable personal property and equipment which a tenant would remove at the end of the lease.

 Defendant claims that plaintiff should not be allowed to recover anything for breach of this oral contract for the reason that all expenditures appear to have been made out of the funds of 22 Ford, Inc. and not those of plaintiff Rea. The evidence shows that Rea was the owner of 91.3% of the capital stock of 22 Ford, Inc. (See plaintiff's Exhibit 118) and, of course, had overwhelming control of the same.

While the facility was being constructed, it appeared that electrical conduits had to be installed in the ground and that hoists also had to be installed for servicing cars. These items were not included in the construction price and this installation was very costly because the mechanism had to be installed in solid rock. In order to get the facility operating and, as believed by the jury, in

---

2. "Sec. 8. Apparent Authority. Apparent authority is the power to affect the legal relations of another person by transactions with the third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."

"Sec. 27. Creation of Apparent Authority: General Rule. Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

"Sec. 50. When Authority to Contract Inferred. Unless otherwise agreed, authority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it."

857

reliance upon Ford commitments that eventually he would own the facility, Rea authorized the contractor to go ahead and make the installations and agreed to pay for them out of his own pocket. Instead of paying for them himself, however, he took the funds to pay the contractor out of the assets of 22 Ford, Inc. which he controlled.

It is the opinion of the court that it does not lie in the defendant's mouth to criticize or raise a question as to where Rea got the funds to which he had committed himself for payment to the contractor. The invoices showing payment of these amounts by 22 Ford, Inc. were introduced without objection by the defendant (plaintiff's Exhibit 11). Rea could have borrowed the money from a bank and had the bank pay the contractor out of a construction fund and the defendant could not raise any question about Rea's right to recover. We do not know what the arrangements between Rea and 22 Ford, Inc. are for repayment of these amounts. They may be considered loans to Rea by the corporation or dividends to him or he may be trustee of these amounts to repay them to 22 Ford, Inc. in the event of recovery. In any event, we do not see that this is any concern of the defendant or in any way militates against Rea's recovery.

Defendant also asserts that Rea is not the real party in interest with respect to this claim and therefore would not be entitled to any judgment. There are two answers to this argument:

(1) Failure to timely object constitutes a waiver of that defense. See McLouth Steel Corp. v. Mesta Machine Corp., 116 F.Supp. 689 (E.D.Pa.1953) aff'd 214 F.2d 608 (3d Cir. 1954) cert. den. Hartford Acc. & Indemnity Co. v. Foster, 348 U.S. 873, 75 S.Ct. 109, 99 L. Ed. 687 (1954).

(2) Rule 17(b) of the Federal Rules of Civil Procedure states: "The capacity of an individual, other than one acting in a representative capacity, to sue or to be sued shall be determined by the law of his domicile" in this case, Pennsylvania. Pennsylvania law is clear that a plaintiff may sue in his own name without joining as plaintiff any person beneficially interested, when such plaintiff is acting in a fiduciary or representative capacity, or is a person with whom or in whose name a contract has been made for the benefit of another. See Pennsylvania Rules of Civil Procedure, rule 2002, 12 P.S. Appendix.

Defendant also argues that these items were trade fixtures which could be removed by the tenant at the end of the lease. The court admonished the jury that Rea was not entitled to recover for any movable equipment but only what he had contributed by way of permanent installation. The hoists and electrical conduits obviously could not, as a practical matter, be removed without seriously damaging the same and the building in which they were installed. For all practical purposes, the monies for these items represented contribution to the permanent overall cost of the building and since Rea is not getting the building, he is entitled to recover these items from the defendant.

The above discussion covers the grounds for new trial pertaining to this cause of action. The motions for Judgment NOV or new trial as to this cause of action will be denied.

(II) *Automobile Dealers Franchise Act.*

The jury has found that defendant Ford breached its duty to act in good faith in performance or in complying with the terms of the franchise or sales agreement between 22 Ford, Inc. and Ford Motor Company as required by the Automobile Dealers Act sometimes known as the Automobile Dealers Franchise Act or the Automobile Dealers Day in Court Act (15 U.S.C. § 1221 et seq). The jury awarded $350,000 damages for this breach of duty.

The relevant sections of this statute are set out in Appendix II hereto.

The complaint in this case, filed March 6, 1967, sets forth under the first cause

of action in paragraph 5 that defendant knew that plaintiff was operating a successful Oldsmobile Dealership known as Rea Oldsmobile, Inc., under the General Motors Franchise in Wilkinsburg and in paragraph 8, it was averred that plaintiff was required to give up 'the General Motors Franchise in order to take over the Ford Dealership and that plaintiff did terminate his Oldsmobile Dealership. In the fourth cause of action, paragraph 35, it is averred that defendant failed to act in good faith in performing or complying with the terms of its franchise agreement with plaintiff and threatened and coerced and intimidated him to enter into a lease agreement and that the defendant's bad faith was further evidenced by failure to formalize the agreement to convey the dealership property to Rea and in paragraph 37, it is averred that these actions of the defendant were in violation of the Automobile Dealers Act, supra. Again, in the sixth cause of action, under the antitrust laws, it was alleged that defendant required plaintiff not to use or deal in the motor vehicles, parts and equipment of General Motors Corporation. This was alleged to be in violation of Section 3 of the Clayton Act and of the Sherman Act. It will be observed that under Section 4 of the Automobile Dealers Act, 15 U.S.C. § 1224, it is provided that this Act shall not repeal, modify or supersede directly or indirectly any provision of the antitrust laws and it has been held that it was intended to supplement the antitrust laws as a part of the antitrust program of the government. Schnabel v. Volkswagen of America, Inc., 185 F.Supp. 122 (N.D. Iowa 1960).

The court instructed the jury that under the Automobile Dealers Act, plaintiffs could not recover for lack of good faith with respect to the failure of Ford to carry out the terms of the alleged contract for conveyance of real estate nor could plaintiffs recover for being required by alleged threats and intimidation to enter into the lease agreement for the use of the facility by the dealership because the Act in question covers only the written agreements contained in the dealership franchise agreement and nothing was said therein (Plaintiff's Exhibit 118) relative to lease of any facilities or any undertaking to convey real estate to the plaintiffs. The court did, however, instruct the jury that they could find a cause of action under the Automobile Dealers Act if they found that the defendant, by coercion, threats and intimidation, had required plaintiff to give up the Oldsmobile Franchise with General Motors because it was specified in the franchise agreement that nothing was to be construed to prevent the dealer from dealing in the products of other manufacturers. (see Tr. 5079, 5083, 5087, 5122 and 5124, Paragraph 3 of Standard Provisions, Plaintiff's Exhibit 118).

There was ample evidence from which the jury could have found such coercion and intimidation as would justify a conclusion that this act was violated. The testimony is to the effect that Mr. Rea had indicated to Ford originally that he intended, if he took over the Ford agency, to sell his Oldsmobile Dealership so as to raise capital to open up the Ford Dealership. Notwithstanding the fact that the franchise agreement (Plaintiff's Exhibit 118) clearly provided that the dealer had the right to make purchases from others, he testified that when he was ready to go into the new facility he asked the Ford District Sales Manager what would happen if he decided to keep his Oldsmobile Dealership and he was told that he had to give it up in order to continue as a Ford Dealer. He apparently thought at that time that he would be able to get sufficient capital without selling the Oldsmobile Dealership and he protested that there was nothing in the Ford Franchise Agreement which required him to give up the Oldsmobile agency. He was then told: "Well, that may be so, but the Ford Sales Agreement doesn't ship cars and the Ford District Office does and if you don't get rid of Oldsmobile, you won't get a new Ford in that new

building." (Tr. 145–148). He was also told, "We are selling you these Fords on condition that you are not going to sell Oldsmobiles when the new building is ready." (Tr. 149) and again, "If you don't get rid of your Oldsmobile Franchise, you won't get a Ford in that new building." (Tr. 835). One can hardly imagine a more devastating threat or intimidation of an automobile dealer than to have the manufacturer tell him that it would not give him any cars to sell unless he complied with illegal requirements contrary to the terms of the dealership franchise.

It will be observed that we do not have here a dealership franchise cancellation case as are most of the cases arising under this Act. Instead, we have a case involving failure to perform the contract in good faith.

One of the leading cases with respect to the application of this Act is Milos v. Ford Motor Co., 317 F.2d 712 (3d Cir. 1963), cert. den. 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963). This was a termination case in which the court determined that enforcement of contractual obligations with reference to assignment of market potential was not coercion and indicated that the first question is whether the contract itself is coercive as written and, secondly, whether it was administered by the manufacturer in bad faith. In the instant case, we determine that the contract was not coercive as originally written but the jury had ample justification for determining that it was administered with bad faith and coercion.

In Buono Sales, Inc. v. Chrysler Motor Corp., 449 F.2d 715 (3d Cir. 1971), a suit for discontinuing the production of the DeSoto Automobile, it was held that there was a violation of the dealership contract but no violation of the Automobile Dealers Act. The Court said that to succeed for violation of this Act, the dealer must show bad faith which requires evidence of coercion, intimidation or threats. It was held that termination alone would not be a violation of the statute but rather it must

have been used as a threat in an attempt to force the dealer to do certain things. The court said: "These examples indicate that Congress was really trying to reach border-line antitrust violations. In fact, the purpose of the Act was to 'supplement the antitrust laws.'" The court further said, "Furthermore, there was no 'wrongful demand which will result in sanctions if not complied with.'" In the instant case, there was a wrongful demand as found by the jury which was to result in severe sanctions if not complied with.

Again, in Berry Brothers Buick, Inc., v. General Motors Corp., 257 F.Supp. 542 (E.D.Pa.1966), referred to with approval in Buono Sales, Inc., supra, there was another termination case affirmed 377 F.2d 552 (3d Cir. 1967). It was held that the test of a cause of action under this Act is lack of good faith in connection with threats and coercion. There must be a wrongful demand. An unreasonable demand to accept cars or parts the dealer does not want "or else" might qualify as a cause of action but, in that particular case, it was held that there were no facts to show the manufacturer did not act in good faith.

Again, in Garvin v. American Motor Sales Corp., 318 F.2d 518 (3d Cir. 1963), another termination case, it was held that to show bad faith, you must show coercion and the court pointed out that the legislative history showed that the manufacturer may appoint additional dealers unless the appointment is used for coercion and intimidation.

In Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645 (3d Cir. 1964), the court held that there was insufficient evidence to support a jury's determination that the manufacturer failed to act in good faith and the court reiterated the rule that the term "lack of good faith" was confined to the context of coercion and intimidation and it was held that plaintiff had failed to show that the manufacturer had discriminated against him and in favor of a competitor in the allocation of automobiles. It was further held that the deal-

ers franchise agreement was an integrated contract and not subject to variation by parol evidence. Further in RAC Motors, Inc. v. World-Wide Volkswagen Corp., 314 F.Supp. 681 (D.C.N.J.1970), it was held that the Automobile Dealers Act created a new cause of action, that the test was not lack of good faith in the ordinary sense but lack of good faith in which coercion, intimidation and threats are implicit.

The present case where there were threats and coercion fits more readily into American Motors Sales Corp. v. Semke, 384 F.2d 192 (10th Cir. 1967). Here a verdict for the plaintiff was sustained where the manufacturer refused to supply its franchised dealer with automobiles unless he ordered unwanted models and the court said, "Such action by a manufacturer comes clearly within the statute as is reflected by the legislative history of the Act mentioned above and thus amounts to coercive or intimidative acts and is sufficient to support a finding of 'lack of good faith' ". There was also evidence that the manufacturer refused to honor its warranties.

As previously pointed out, the complaint in this case clearly alleged the requirement that plaintiff get rid of his Oldsmobile or General Motors Dealership as a violation of Section 3 of the Clayton Act (15 U.S.C. § 14).[3] Since there was a factual question as to whether the effect of the demand on Rea requiring him to give up his Oldsmobile Dealership and thus not use or deal in the goods of a competitor of Ford Motor Company did lessen competition, this question under Section 3 of the Clayton

Act was submitted to the jury. (Tr. 5085, 5086, 5113, 5114). The court, however, did comment that it would not appear that the effect of this transaction was substantially to lessen competition or tend to create a monopoly in any line of commerce for the reason that it appeared that when Rea got rid of his Oldsmobile Dealership, it was to another dealer who immediately continued the business and was still in operation and thus there was no change in the competitive position of General Motors, vis-a-vis Ford. The court was concerned particularly that the jury might find a violation of Section 3 of the Clayton Act and award damages including this item in the general award of damages for violation of the other antitrust laws thus resulting in a recovery duplicating that under the Automobile Dealers Act. The jury's special verdict shows, however, the intelligence and discrimination with which the jury approached these issues because in answer to question 8, as to whether the defendant had violated Section 3 of the Clayton Act, by forbidding Rea to deal in goods and commodities of a competitor, viz: Oldsmobile automobiles, where the effect was substantially lesser competition or create a monopoly, they answered: "No". It is thus clear that the jury did not consider this conduct as violating the other antitrust laws but did specifically find a violation of the Automobile Dealers Act.

We find nothing inconsistent with respect to these findings of the jury. As pointed out in the court's charge, a violation of Section 3 of the Clayton Act was at best questionable under the evi-

---

3. *"Sale, etc., on agreement not to use goods of competitor.* It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, *where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.* Oct. 15, 1914, c. 323, Sec. 3, 38 Stat. 731."

dence in this case and the jury merely viewed this in the same light as the court. On the other hand, the jury clearly found under other instructions of the court that there was coercion and intimidation in violation of the Automobile Dealers Act and awarded damages accordingly. In the Title to the Automobile Dealers Act as quoted by our Court of Appeals in Bateman v. Ford Motor Co., 302 F.2d 63 (3d Cir. 1962) the purpose was stated to *"supplement* the antitrust laws in the United States in order to balance the power now heavily weighted in favor of automobile manufacturers * * *"*. Thus, Congress clearly envisaged that certain conduct by a manufacturer might not rise to the heights of an antitrust violation but nevertheless constitute such inequity as demanded a remedy and that is what the jury determined in this act.

Notwithstanding the above, defendant raises various objections to the jury's verdict under the Automobile Dealers Act:

(a) *Claim not pleaded.*

 (a) It is claimed that the allegations supporting this cause of action were not contained in the complaint or in plaintiff's pretrial narrative statement. We have previously pointed out the allegations pertaining to demands that he cancel his General Motors Franchise were contained in the sixth cause of action in the complaint in which he claimed violation of Section 3 of the Clayton Act and also the Sherman Act and in the fourth cause of action alleging violation of the Automobile Dealers Act, it was alleged that the defendant failed to act in good faith in performing or complying with the terms or provisions of its franchise agreement by deceiving and threatening plaintiff with respect to the lease agreement.

In the pretrial narrative statement, at page 16, a claim was made for damages from losses sustained by Rea Oldsmobile, Inc. (a predecessor as will be discussed later) resulting from the requirement that the Oldsmobile contract be terminated and that plaintiffs would not sell other products. At page 22, in the claim for damages, a claim was made for loss of estimated gain and net worth by Rea Oldsmobile of $400,000. At page 45 and 46, claims were set forth under the Automobile Dealers Franchise Act as the result of the failure of the manufacturer in good faith to comply with the franchise agreement.

"The fact that plaintiff has postulated a faulty theory in support of the claim does not justify dismissal if there are grounds for relief on another theory." Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955 (N.D.Ill.1972).

 It thus appears that defendant was well informed that plaintiff was basing a claim upon the requirement that he cancel his Oldsmobile Franchise. We are taught that pleadings in antitrust actions are to be given a liberal interpretation. See Travis v. Fairmount Foods Co., 346 F.Supp. 679 (E.D.Pa.1972); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957); Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 421 F.2d 1313 (5th Cir. 1970). In view of the fact that defendant had ample notice and warning that plaintiff was relying upon the enforced cancellation of its Oldsmobile Franchise as part of its causes of action, it is our opinion that it was in the power of the court to prevent manifest injustice to allow this issue to go to the jury and that this was not an abuse of discretion. See Moore v. Sylvania Electric Products, Inc., 454 F.2d 81 (3d Cir. 1972). See also Sherman v. United States, 462 F.2d 577 (5th Cir. 1972) where the court said:

"The trial judge is vested with broad discretion to preserve the integrity and purpose of a pretrial order. Basically, these orders and stipulations, freely and fairly entered into, are not to be set aside except to avoid manifest injustice. Fed.R.Civ.P. 16. However, in the interest of justice and sound judicial administration, an amendment of a pretrial order should be permitted where no substantial in-

862

jury will be occasioned to the opposing party, the refusal to allow the amendment might result in injustice to the movant, and the inconvenience to the court is slight. See Central Distributors, Inc. v. M.E.T., Inc., 5 Cir. 1968, 403 F.2d 943, 946; Henry v. Commissioner of Internal Revenue, 5 Cir. 1966, 362 F.2d 640, 643; Laird v. Air Carrier Engine Service, Inc., 5 Cir. 1959, 263 F.2d 948."

See also Rule 16 of the Federal Rules of Civil Procedure. If defendant had not been well aware that plaintiff was relying in part on the enforced cancellation of its Oldsmobile Franchise our decision would be otherwise.

(b) *The Statute of Limitations.*

■■ As noted above, the Automobile Dealers Act in Section 3 (15 U.S.C. § 1223) provides a three-year statute of limitations "after the cause of action shall have accrued". The complaint was filed March 6, 1967. The Oldsmobile Franchise was cancelled by plaintiff on August 31, 1964, well within the three-year period. This cancellation was the result of threats of Ford representatives made during the period March 1, 1964 to August 31, 1964 (Tr. 144–148). We hold the cause of action did not accrue until the cancellation on August 31, 1964, well within the three-year period.

(c) *Failure to Submit Dispute to Dealer's Policy Board.*

■ We have examined plaintiff's Exhibit 118, paragraph 2(g) of Standard Provisions upon which defendant relies and can find therein no clear requirement that plaintiff had to submit disputes arising out of threats and coercions to stop delivery of cars to him to the Dealers Policy Board as a prerequisite to bringing suit in court for violation of the Automobile Dealers Act and it is questionable whether such a clause could oust the court of jurisdiction to entertain the suit under the Act, particularly when the matter complained of is tied in with threats and coercion and intimi-

dation. This is not a clause that requires submission of disputes to arbitration as a condition precedent to bringing action in court. We therefore do not reach the question of whether submission of the issues to such a Board apparently dominated by the company executive committee would be a vain thing under the circumstances.

We have considered Bateman v. Ford Motor Co., 302 F.2d 63 (3d Cir. 1962) and the district opinion on remand Bateman v. Ford Motor Co., 214 F.Supp. 222 (E.D.Pa.1963) in which there was dicta to the effect that the dealer breached his contract by not reporting acts of coercion to the Dealer Policy Board. But there the court also found there was no coercion, intimidation or lack of good faith on the defendant's part. It appears that the clause in question (2g) in Bateman, as here, did not require submitting claims of coercion and so forth to the Policy Board as a requirement for bringing suit or specify any penalty for failure to bring the matter to the Board.

(d) *Claim Made By Wrong Party.*

■ The jury in this case very properly awarded the damages for violation of the duty owed under the Automobile Dealers Act to 22 Ford, Inc., the authorized Ford Dealer. Defendant now claims that if there was any cause of action for violation of the Automobile Dealers Act, the same belonged to a separate entity viz: Edward C. Rea, Inc. d/b/a 22 Ford Sales, Inc.

The original franchise agreement had been awarded to Edward C. Rea, Inc. d/b/a 22 Ford Sales, Inc. on February 11, 1964 (plaintiff's Exhibit 118). This agreement was later, on March 9, 1966, assigned to 22 Ford, Inc., the corporate plaintiff in this law suit. This assignment was accepted and consented to by the defendant on April 21, 1966, and defendant Ford also consented to the change of name of the dealer to 22 Ford, Inc. It is clearly indicated that plaintiff, Edward C. Rea, the individual plaintiff, owned 91.3% of the capital stock of 22

Ford, Inc. The original threats were made personally to Edward C. Rea, a person in control of both corporations. Under the Automobile Dealers Act, only the dealer can bring suit. The threats made to Mr. Rea in March through August, 1964, obviously referred to what would happen to the corporate dealer if Rea did not get rid of his Oldsmobile Dealership and these threats gave rise to a cause of action under the Automobile Dealers Act. This cause of action was included in the transfer of rights under the dealership agreement to 22 Ford, Inc. in April 1966 and thus 22 Ford, Inc. as a successor to Edward C. Rea, Inc.'s rights under the franchise was entitled to bring suit and recover damages resulting from those threats.

(e) *Damages Excessive or Conjectural.*

 The damages allowed by the jury in the amount of $350,000 were amply sustained by the testimony of the expert Dr. Staelin and the exhibits prepared by him (plaintiff's Exhibits 242 (a), (b) and (c). He projected the profits which would have been obtained had the Oldsmobile Dealership been continued and came up with two figures either one of which he testified was proper, one of $559,000 and the other of $690,000. These figures were based upon profits before taxes and bonuses. The jury very properly concluded that other factors should be considered and allowed only $350,000 which again demonstrates the discriminating care with which the jury approached this case. It will be noted that Dr. Staelin only projected the lost profits to the date of trial and did not allow anything for the future which might have been too speculative to consider. See Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962). The jury was told at Tr. 5087 that the validity of Dr. Staelin's testimony was for them to determine, that they could adopt or reject it in whole or in part.

(f) *Trial Errors.*

Defendant complains of certain trial errors as to this cause of action:

 (1) It is claimed the court erred in instructing the jury as to the purpose of the Automobile Dealers Act in mentioning the large economic power of the manufacturer versus that of a single dealer. (See Tr 5077–5083) It should be sufficient answer to this that there does not appear to have been any exception taken to this. Regardless of this, all the court really did was explain to the jury the purpose of the act as set forth by the Court of Appeals in Milos v. Ford Motor Co., supra, and tell them that the question as to the wisdom of this legislation was a matter for Congress to decide. We see no error here. This is paragraph 23(b) of the Motion for New Trial or Judgment NOV.

(2) In reason 23(q) of the Motion for New Trial, defendant complains of the court's charge with respect to coercion and intimidation by Ford representatives as being a violation of the Automobile Dealers Act. This has been fully covered in the foregoing discussion in this section of the opinion and merits no further mention here.

(3) Reason 23(a) of the Motion for New Trial complains of the court's remark to the jury that they could find that Rea had changed his mind about selling his Oldsmobile Dealership. (Tr 5086) This is in accordance with Rea's testimony at Tr. 831–835 where he stated that he had inquired what would happen if he decided not to sell his Oldsmobile Dealership and was told he would get no more cars.

The Motions for Judgment NOV or new trial with respect to the cause of action based upon violation of the Automobile Dealers Act will be denied.

(III) *Sherman Act, Section 1.*

With respect to the antitrust laws, plaintiffs' first claim is that there was

a violation of the Sherman Act, Section 1.[4]

For this plaintiffs claim they are entitled to recover damages under Section 4 of the Clayton Act (15 U.S.C. § 15).[5]

Since there is no evidence of any contract in restraint of trade, we must turn our attention to the question of whether the evidence shows a combination or conspiracy in restraint of trade or commerce among the several states or with foreign nations and whether this has resulted in damage to the business or property of the plaintiffs. The jury so found in answering questions 6 and 7 in the affirmative and answered a question as to Section 3 of the Clayton Act (question 8) in the negative and then found plaintiffs' damages were $1,750,000.

There seems to be no dispute that both defendant and the plaintiffs were engaged in interstate commerce. The vehicles which plaintiffs sold came from assembly plants in other states and Canada. Plaintiffs' sales were made not only in the Pittsburgh, Pennsylvania area but also to persons in other states.

It is elementary of course that a defendant such as Ford Motor Company cannot conspire with itself or combine with itself to restrain trade. However, it has also been held that a parent corporation such as Ford Motor Company here can conspire with its wholly owned subsidiaries. Perma Life Mufflers v. International Parts, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). See also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U. S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1950). In this case there is evidence that the defendant conspired or combined with its wholly owned factory stores and dealer development stores which the evidence

shows were separate corporations. The prime target of plaintiffs' evidence in this case is the operation of the store on Baum Boulevard in Pittsburgh, Pennsylvania known as Triangle Ford which it appears was a wholly owned factory store. There were also others at various times in the Pittsburgh area. The evidence shows that not only Ford Dealers but also Lincoln-Mercury Dealers compete with each other and with Ford Dealers.

In this connection, the defendant claims that the court erred in referring to Ford Marketing Corporation as a possible subsidiary with whom the defendant could conspire or combine in restraint of trade. [See reason for new trial 23(d).] The claim is made that Ford Marketing Corporation was not incorporated until 1970 and that most of the injury and damage had occurred before this date.

A close examination of the court's charge on this subject which is found at page 5100 et seq., where there was discussion relative to a corporation conspiring with itself or with its subsidiaries will show that the Ford Marketing Corporation was used merely as an illustration of how a manufacturer could conspire with its subsidiaries. If the court misunderstood the evidence as to the date the Ford Marketing Corporation entered the picture, this could have easily been corrected had the court's attention been called to it, but the record shows there was no exception taken to this part of the charge. See page 5126. See Federal Rule of Civil Procedure 51, Morley v. Branca, 456 F.2d 1252 (3d Cir. 1972).

It is elementary that the existence of a combination or a conspiracy may be shown by circumstantial evidence

4. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

5. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. Oct. 15, 1914, c. 323, Sec. 4, 38 Stat. 731."

and may be inferred from the circumstances of the case. Ordinarily, in the case of a conspiracy, the fact of the conspiracy is seldom capable of proof by direct testimony and is inferred from the things actually done. This is particularly true of that portion of the Sherman 1 case here which pertains to the fleet sales to Hertz and Avis and other national car leasing companies. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945); Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir. 1957). Kiefer-Stewart v. Seagrams, supra. In United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1965), the court stated:

"It has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy * * *"

It further stated:

". . . nor do we propose to construe the Sherman Act to prohibit conspiracies to fix prices at which competitors may sell, but to allow conspiracies or combinations to put competitors out of business entirely."

In the instant case, Ford Motor Company, by operating factory stores and dealer development stores which were under its domination, was in competition with its own dealers. Therefore, when it adopted a course of action in combination with such stores to drive any of these independent dealers out of business or to dominate the market, it was certainly engaged in combination or conspiracy or restraint of trade under the Sherman Act. See United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). We have no doubt that there is nothing inherently evil in a dual distribution system whereby a manufacturer may sell its own products to the customers directly through company outlets along side in-dependent dealers. [See the remarks by the Antitrust Division of the United States Department of Justice—Hearings before the Select Committee on Small Business of the United States Senate Judiciary Committee (1963) quoted at page 58 of plaintiffs' post-trial brief.] When, however, the manufacturer who as in this case is a member of an oligopoly [6] secretly sets up factory stores and so-called dealer development stores for the avowed purpose of dominating the market in certain metropolitan centers regardless of the consequences to the independent dealers or for the avowed purpose of driving them out of business, then a violation of the antitrust laws occurs. Ford, the second largest manufacturer of automobiles in the United States, is the only source of Ford motor vehicles, and if it chooses to dominate a local market through the operation of factory stores and dealer development stores, it is certainly in a position to do so.

The record in this case contains evidence which, if believed by the jury, as it obviously was, shows a predatory intent on the part of the defendant to dominate certain metropolitan markets to the damage of its independent distributors such as the plaintiff herein. We do not in this case have to rely upon inferences from circumstantial evidence to determine Ford's intent. Here, in contrast to many other cases, we have actual undenied evidence of such purpose.

Witness Schroll testified to certain statements made by executives of the Ford Motor Company which clearly showed this intent. (See Tr. pp. 1340–1346). For instance, George Callas, Dealer Development Executive, was quoted as announcing a plan to place factory stores in the major metropolitan marketing areas of the United States "to get dominance in those markets" even though the

6. An oligopoly is defined (Tr. 4531) as a market situation where a very few producers control the market. The testimony is that in the automobile field, General Motors has 40% of the market, Ford has 25%, Chrysler 18%, American Motors a very small percentage and foreign car manufacturers have risen from a small percentage to approximately 15%.

effect would be to drive the independent dealers out of these marketing areas. It was stated there were twenty major metropolitan marketing areas in the country which were the target of Ford's plan and Pittsburgh was listed as one of them. At a meeting in which several Ford Executives were present including the national sales manager, the view was expressed: "We don't care about the dealers. We are going to operate the factory stores. If they don't like it, the hell with them." This evidence was clinched by a statement attributed to Mr. Iacocca, then head of the Ford Division, now President of the whole Ford Motor Company, at a meeting in New York where he stated that the company intended to operate factory stores and if necessary were going to get more factory stores and they were going to acquire dominance in the twenty major marketing areas in the United States and if the dealers didn't like it, in effect "to hell with you". Despite the fact this testimony appeared early in this trial which took five and one half weeks, Mr. Iacocca never appeared in court to deny making these statements. This naturally would weigh heavily with the jury.

It is obvious what the motives of Ford Motor Company were. They saw that certain dealers were making considerable profits from the sale of Ford vehicles. The company itself was making a profit of between $300 and $600 on each car manufactured and if they embarked on a program "to get the numbers out" (Schroll Tr. 1062) they could easily afford to infuse large amounts of capital into the factory stores and suffer losses in the operation of the stores but still make an overall profit on the manufacture of the cars. It was pointed out that consolidated income tax returns were filed whereby losses in the operation of company store subsidiaries could be offset against the profits of the manufacturing operation. (See Schroll 1236, 1523).

■ The above discussion also deals with reasons 23(h), 23(1) and 23(v) of defendant's reasons for new trial dealing with the statements by Iacocca, Barclay and Callas. Defendant claims that there was a misquotation of these statements. However, we have examined this and cannot see any substantial misquotation. In any event, the jury was cautioned that it was their memory of the testimony and not the court's which controlled (Tr. 5073). With respect to the claim that the jury was not told that Schroll's statements were denied by Ford officials, this was dealt with at Tr. 5104 where the jury was told to consider the statements of Ford officials in this connection. Defendant also complains in reason 23(i) that the jury was told to consider Schroll's present activities. This actually was prejudicial to plaintiff since it called attention to the fact that Schroll was engaged in attempts to prosecute claims against Ford Motor Company which would show a motive on his part for his testimony. The court holds that all these reasons are without merit.

This brings us to the two main elements upon which plaintiffs rely with respect to their action for violation of the antitrust laws. These are: (1) operation of factory stores or dealer development stores in the area and (2) fleet sales to Hertz and Avis fleet leasing companies.

■ (1) *Operation of Factory Stores.* Much of what is said under this heading is also applicable to the attempt to monopolize by Ford under Sherman Act, Section 2. It has been held that the same evidence of a conspiracy which is applicable to Sherman, Section 1 may also be applicable to Sherman, Section 2. Industrial Building Materials Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1970); Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Mt. Lebanon Motors, supra. The evidence shows that under the Ford distribution system, there are two types of enterprises which may be called factory stores for the purpose of this case. Generally speaking, Ford has relied upon independent dealers or dealers to distribute its product, and historically this is true of the whole auto-

mobile industry. Dr. Staelin quoted from a book by Alfred P. Sloane, Jr., long time President and Chairman of General Motors Corporation, to the effect that the independent dealer is a person upon whom the automobile industry depended for success. The evidence shows, however, as did the evidence adduced in Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa.1968) aff'd by the Third Circuit, 417 F.2d 622 (1969) that Ford Motor Company, like Chrysler Corporation had some time in the 1960's begun to develop so-called factory stores which were enterprises wholly owned by the Ford Motor Company and whose officers and employees were actually managers sent out by Ford to manage the enterprise. In addition, there were also dealer development stores where a prospective independent dealer would have insufficient capital to take over a dealership on his own, and a part of the capital would be advanced by the Ford Motor Company. If the enterprise was profitable, the profits would be used to purchase the stock for the independent dealer who would eventually own the dealership. If, however, the enterprise was unprofitable, the losses would be deducted from the proposed dealers investment and then when this was wiped out the dealership would become a wholly owned factory store. The evidence shows that Ford went to considerable lengths to conceal the fact that certain dealerships were factory owned or were dealer development stores which had become company owned. While the main thrust of plaintiffs' evidence was aimed at the factory store known as Triangle Ford located on Baum Boulevard in Pittsburgh, Pennsylvania in so-called "automobile row", nevertheless the evidence showed that at various times there were other factory stores or dealer development stores which lapsed into the category of company owned such as Northland Ford, South Hills Lincoln-Mercury, Gateway Lincoln-Mercury, Crest Lincoln-Mercury, Liberty Ford, Northway Lincoln-Mercury, East Hills Ford and Allegheny Ford Truck Sales. (See Plaintiffs' Exhibit 239). This exhibit shows that these stores sold 6703 units in varying periods of time during the years involved and also shows the losses incurred by them during the period which averaged $121.05 per vehicle. There was also testimony that Ford Dealers were in competition as to many models with Lincoln-Mercury Dealers.

 Whether dual distribution is or is not illegal or evil in and of itself, it does become an antitrust problem in the context of its use by a company possessing substantial market power. (See hearings before Select Committee on Small Business cited at page 61 of plaintiffs' brief.) The evidence here shows that Ford Motor Company, the defendant, is the only source of Ford and Lincoln-Mercury automobiles, trucks and other automotive products. An independent Ford Dealer has a large investment in money and good will tied up in Ford vehicles and facilities for them. Under the terms of the sales agreement, he must use his best efforts to achieve the full extent of Ford market penetration reasonably anticipated in his area. He cannot turn to another manufacturer for vehicles. If he is shut off, he strangles to death in a short time. Thus, if Ford for its own purpose chooses to use its company stores and dealer development agencies for the purpose of maximizing its profits through large subsidies to these company-owned facilities with the result that private dealers are put at a substantial economic disadvantage, it is the court's opinion that a cause of action is made out under Sherman 1. It has been well stated in this case that Ford is a sub-market among automobiles because of the very nature of the distribution system of new cars and we have the further factor that it is stated that the loyalty percentage (the tendency to return to purchase a new Ford as a replacement for a present car) of Ford owners is as high as 90%. Since Ford has 25% of the market for new cars in this country, it certainly is a substantial part of the trade or commerce among the several states as described in Section 2

of Sherman or in holding it to be substantial portion of trade which may be restrained under Sherman Section 1.

Evidence showed that Triangle Ford, a wholly owned company store, (Tr. 1040) spent from two to three times as much for advertising per new vehicle as independent dealers. Backed as it was by the resources of the manufacturer, independent dealers could not possibly keep up with the amount of advertising placed by Triangle Ford. (Tr. 1060 and 135). The company dealership was able to afford many more salesmen than a private dealer could finance. (Tr. 137) The evidence also indicated that the defendant was able to infuse large sums of capital into this company store and chose to provide therein much better facilities than a private dealer could supply. When the money ran low, Ford Motor Company would make more capital contributions either by way of stock purchases or lending on notes. (Tr. 1074) When the manager of Triangle protested about the losses they were incurring, he was told that Ford did not care what it cost or what he spent as long as he got the numbers out, i. e., moved a large number of automobiles. He was told that Ford did not care what they lost or what it cost to sell the cars. (See Tr. 1064 and 1144). This is a classic example of what Judge Dumbauld in Mt. Lebanon Motors, supra, calls the use of adventitious profits to subsidize a local dealer and which Dr. Staelin described as maximizing profits by subsidizing losses. Thus it is pointed out that Ford was still making a profit on each car sold and also getting an income tax deduction for any losses incurred by a subsidiary. These losses over the years in question which were subsidized by Ford came to more than $500,000.

The result was to place plaintiff at a competitive disadvantage. This was more than he could afford to spend for advertising and for salesmen. (See pp. 1171 and 1249 of transcript for detailed figures.)

At Tr. 5108, the court in its charge discussed these factors with the jury and at 5123 told the jury that there was nothing wrong with dual distribution as such but they should consider this in the light of testimony of various Ford executives as to using this method for the purpose of dominating the market in certain metropolitan centers. The jury was also told of Ford's explanation for factory stores, that they regarded them largely as temporary expedients in areas where they wanted to have a dealer but were unable to secure one at the time. The jury could consider however that Triangle Ford was in business insofar as this case is concerned for a period of six years. It was stated that the only reason for a factory store to be continued over a long period of time existed where they wanted to continue to have representation but felt they never would be able to get a dealer, such as in Manhattan. There was also testimony that by the time of the trial the number of factory stores throughout the country had been drastically reduced. It appears however that this effort to reduce the number of factory stores started after this suit was brought, and as to what weight the jury would give this testimony under these circumstances was a matter for them to decide. This disposes of defendant's reason for new trial 23(bb) relative to discrimination and the infusion of capital into factory owned stores.

The court did not tell the jury that this conduct on the part of Ford was necessarily a per se violation of Sherman Section 1 but the jury was told that they had to find that this was an unreasonable restraint of trade under the circumstances. The above discussion disposes of defendant's reasons for new trial number 23(d) as to a substantial amount of trade being involved, 23(e) complaining that the jury was told that the amount of trade was immaterial, and 23(f) as to telling them that the motives of the defendant were immaterial. The court never told the jury that there was an unreasonable restraint of trade or a per se violation of the Sherman Act. Whether antitrust violations existed was entirely left to

the jury to decide. The extent to which the defendant has gone in grasping for arguments to justify a new trial is shown in reason 23(z) where a quotation was taken from the transcript of the charge where the court is alleged to have said, "which *I* claimed to be violated". It appears that this was a typographical error in the transcript which the reporter has corrected to show what was actually said, i. e., "which *it* claimed to be violated". An examination of the charge as a whole will show that such a remark if made would have been entirely inconsistent with the rest of the charge. At page 5059, the jury was told to consider the charge *as a whole*. *No exception was taken to this remark.*

Defendant further argues that if there was any attempt to dominate this market or a conspiracy to drive out independent dealers, it ended in 1967, when Mr. Schroll left Triangle Ford, because of certain testimony by his successor. The jury did not have to believe this testimony. They could well conclude that the testimony of Mr. Iacocca and others about their attempts to dominate the market continued up until shortly before trial when they made a hurried effort to get rid of company owned stores. Defendant also claims that the statements attributed to Mr. Iacocca, Mr. Callas and other Ford executives were made before 22 Ford was formed. This may be true but the evidence shows that the intent expressed in these statements of Ford executives continued for several years in the Pittsburgh metropolitan area.

The best exposition of the application of antitrust laws to a situation of this kind is found in the exhaustive opinion of Judge Dumbauld of this court in Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa.1968) aff'd 417 F.2d 622 (3d Cir. 1969).

The facts in Mt. Lebanon were strikingly similar to those of the instant case, and in Judge Dumbauld's opinion is a thorough exposition of the principles of antitrust law applicable to situations of this kind. It will be noted that in Mt. Lebanon, supra, the court held as did we here that there was no violation of the Robinson-Patman Act in the financing of company stores and dealer development stores. There was no evidence of price discrimination as such between dealers in the Pittsburgh area, (See Tr. 5067) and we held that absent such price discrimination between dealers, there was no violation of the Robinson-Patman Act (15 U.S.C. § 13) or Section 3 of the Clayton Act. Favorable terms of leasing and conveyances of real estate are not a violation of Robinson-Patman as charged by plaintiffs: Export Liquor Sales, Inc. v. Ammex Warehouse Co., 426 F.2d 251 (6th Cir. 1970). Financial advantages derived by advancing large amounts of money to a factory store dealership also did not amount to price cutting in violation of the Robinson-Patman Act. The Robinson-Patman Act has nothing to do with extensions of credit or things of that nature. (See Mt. Lebanon, 283 F.Supp. at pages 457, 458); Kapiolani Motors v. General Motors Corp., (D.C.Hawaii, 1972) 337 F.Supp. 102; Texas Gulf Sulphur Co. v. J. R. Simplot Co., 418 F.2d 793 (9th Cir. 1969); Secatore's, Inc. v. Esso Standard Oil Co., 171 F.Supp. 665 (D.Mass.1959); I. M. Skinner v. United States Steel Corp., 233 F.2d 762 (5th Cir. 1956).

The Mt. Lebanon Motors court, however, went on to hold that the facts there did justify, as we held in the instant case, a finding by the jury that there was a violation of Section 1 of the Sherman Act and because of the thoroughness of that opinion, we quote at length from it in this respect.

"Plaintiff offered evidence tending to show that the Chrysler financed dealerships, commonly called 'factory stores', *engaged in price-cutting and massive advertising, to the detriment of privately financed dealerships in the Pittsburgh area,* which were not able to afford advertising on such a large scale or to accept profits as small as those obtained by the factory stores in their deals with customers.

870

"Plaintiff's proof tended to show that the factory stores consistently lost money and were unprofitable; but that from time to time, when circumstances required, Chrysler would make gifts or additional investments in the form of 'capital contributions' to the factory-financed dealerships, thus enabling them to continue in business, notwithstanding their losses resulting from their normal operations.

"There was also evidence that the 'dealer enterprise' division of Chrysler would from time to time furnish temporary employees to the factory stores when they experienced a shortage of adequate personnel and would furnish assistance to the factory stores in establishing their accounting systems and would also furnish substantial advertising allowances in launching the new dealerships.

\* \* \* \* \* \*

"Upon renewal of defendant's motions at the close of all the evidence, we adhere to the view that a jury question is presented with respect to whether or not Chrysler has violated Section 1 of the Sherman Act . . .

"We are satisfied that there is no problem with respect to finding the existence of a contract, combination, or conspiracy.

"Chrysler Corporation manufactures motor vehicles and sells them at the source to its wholly owned subsidiary Chrysler Motors Corporation. Chrysler Motors Corporation enters into contracts, designated sales agreements, with each franchised dealership, which is a separate corporation. In the case of factory stores, whether wholly owned or under the DE plan, Chrysler Motors Corporation owns stock, and designates directors, and controls the activities of the dealership to the extent provided in the sales agreement. Chrysler Motors Corporation also seeks out and engages individuals to act as manager of the factory stores and enters into contractual agreements with them, including in some cases special provisions for

bonus in addition to the salary paid as manager of the factory store.

"While there is no occasion in the case at bar to go so far as to attempt to find a 'bathtub conspiracy' between a corporation and its own employees, it seems clear that here there are a sufficient number of separate legal persons, both individual and corporate, to constitute a combination or conspiracy. Corporate affiliation or common ownership does not insulate against liability for violation of the antitrust laws. United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 597–598, 71 S. Ct. 971, 95 L.Ed. 1199 (1951).

"Turning to the substantive question as to the nature of the restraints forbidden by Section 1, it is to be noted that since the famous decision in the Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 63–64, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Act has been interpreted as if the word 'unreasonable' were inserted before the word 'restraint'. Subsequently the 'rule of reason' has been modified by the development of rules declaring certain restrictive practices to be unreasonable restraints per se. These *per se* violations include, for example, price-fixing, resale price maintenance enforced by concert of action without the benefit of statutory legitimization, euphemistically sometimes referred to as 'fair trade' laws, concerted boycotts or refusal to deal, secondary boycotts, or tying a patent to the use of unpatented materials. See United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

"We are aware of no authorities indicating that the facts alleged in the case at bar would constitute a violation *per se*. They may well, however, support a charge of unreasonable re-

straint. Chrysler's forward integration somewhat resembles the 'sheet squeeze' employed by Alcoa. United States v. Aluminum Co. of America, 148 F.2d 416, 436–437 (C.C.A.2, 1945). Moreover, they do appear to present a jury question as to whether there has been an unreasonable restraint of trade of the classical pattern engaged in by the Standard Oil Company which may have contributed to the enactment of the Sherman Act. Predatory price-cutting in one locality, subsidized by adventitious resources, for the purpose of eliminating competition and then presumably raising prices to a non-competitive level, constitutes a classical example of restraint of trade.

"The adventitious advantage, unrelated to the competitive merits of the competing sellers in the market involved, may be of a geographical nature, as where a large national company cuts price in a limited local geographical area; or the adventitious advantage may be derived from profits obtained in a different line of commerce, as in the case of the conglomerate mergers which are so popular today.

\* \* \* \* \* \*

"To eliminate competition by putting out of business one dealer after another individually, by excluding competitors from any substantial market, constitutes a restraint of trade, even if there is no general effect upon the economy as a whole. International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)."

Another case dealing with the use of adventitious profits to put competitors at a disadvantage is Reynolds Metals Co. v. FTC, 114 U.S.App.D.C. 2, 309 F.2d 223 (1962). (See reference by Burger, Circuit Judge, now Chief Justice, to the "Deep pocket" p. 229).

■■ The jury was instructed at Tr. 5097 that they must find that these

procedures by Ford unreasonably interfered with free pricing or distribution and the jury so decided. We must always remember that the "theory in back of the Sherman law is to protect the free movement of goods in interstate commerce against unreasonable restraints to assure open interstate markets where traders may freely negotiate sales and to preserve the normal competitive forces which otherwise might operate in these markets". United States v. General Motors Corp., 121 F.2d 376 at 403 (7th Cir. 1941). The jury here was justified in finding that the operation of factory stores and dealer development stores under these circumstances by Ford Motor Company did interfere with the normal competitive forces which would otherwise operate in the retail sales of automobiles in the Pittsburgh area.

■ (2) *Fleet Sales to National Leasing Companies.* The defendant claims that it was not apprised of the nature of plaintiffs' claims with respect to sales to national car rental fleets. At pages 14 and 15, however, of plaintiff's pretrial statement, it was clearly set forth that plaintiff was claiming discounts, fixing of prices, subsidization of advertising budgets and special allowances to national car rental fleets. It therefore appears that defendant had ample notice of the nature of this claim.

The evidence shows that plaintiff, 22 Ford, Inc., engaged in sales of cars to national fleet leasing companies, particularly Avis and Hertz, from 1964 to 1970 at which time plaintiff refused to participate in these sales any longer. The evidence is that a title to an automobile sold to one of the national fleet leasing companies first passes from the defendant to a dealer. The dealer then has to put the car in shape for operation, provide the Pennsylvania inspection sticker, and deliver the car, having assumed the warranty, to Hertz or Avis at the Pittsburgh Airport, a distance of 16 to 18 miles.[7]

7. When the words "Hertz or Avis" are used herein, they refer to Hertz Car

Rental Service and Avis Car Rental Service, national leasing corporations.

The dealer, however, does not determine the price at which the car is sold to Hertz or Avis. (Plaintiffs' Exhibit 218 being plaintiffs' book of invoices reflecting sales to these leasing companies shows that the invoice when received from the factory indicates the price at which the car is to be sold to Hertz or Avis.) Invariably, the price was the invoice price to the dealer plus $50.00 less 1%. For example, if the price to the dealer was $2,500, he would add $50.00 to it making $2,550 and then subtract 1% or $25.50, making the net price to Hertz or Avis of $2,524.50. The dealer would thus have $24.50 left to cover the above-mentioned costs. He was charged interest by the company owned finance company from the date of *the delivery* of the car to him, whereas Hertz or Avis would not pay the invoice for 30 or 60 days with the result that after paying the interest owing to the finance company he was left with a loss on the sale of the car. It is true that the dealer was not forced to engage in these sales to fleet rental companies but on the other hand he had to use his best efforts to "get out the numbers", (sell as many Fords as possible under his franchise or be charged with dereliction.) We can well understand why plaintiff and other dealers would feel that they had to go along with this arrangement. (See Tr. 239, Plaintiffs' Exhibits 183, 184 and 185).

This method of compelling dealers to charge the same price to the national fleet leasing companies has been in effect for some years. It makes no difference whether the car is large or small (Tr. 250) and there can be little doubt that defendant Ford fixed the price at which these cars were to be sold to Hertz or Avis. When witness Schroll of Triangle Ford once attempted to negotiate some other terms with Hertz and Avis and even attempted to negotiate a lower price which would result in greater losses, he stated 1193, 1194 that this suggestion was turned down by the national fleet office of Ford Motor Company as disrupting their national fleet program.

The testimony as to the standard arrangements with Hertz and Avis is supported by the testimony of Schrekengost (Tr. 1741, et seq) and Wood (Tr. 1561, et seq).

Further facets of the sales to national leasing companies included arrangements for buy back of the cars after the lapse of a summer rental season in which case the Ford Motor Company guaranteed Hertz or Avis the price they would receive for repurchase which the dealer had to promise to abide by. (See Schroll 1204, Schrekengost 1757). The effect of this, however, was somewhat minimized by Ford agreeing to reimburse the dealer for a part of the losses which he would sustain by agreeing to the repurchase price.

Other arrangements between Ford and Hertz and Avis included rebates included in the purchase price covering various accessories which would be invoiced at "no charge" such as side moldings, nylon carpeting, courtesy lights, certain types of tires and a more powerful engine for the price of a cheaper engine. (See Rea 225, Plaintiffs' Exhibits 106, 218). Nowhere during the trial of this case did Ford attempt to rebut this testimony or claim that these prices or arrangements were not fixed in advance.

The court in its charge (Tr. 5112) left it to the jury to determine whether the testimony on these arrangements showed a restraint of trade in violation of Sherman Act, Section 1. We can well understand that with the tremendous purchasing power of Hertz and Avis any automobile manufacturer would be under great pressure to fix maximum prices for which these large companies could buy their fleets. For example, the testimony shows that Avis alone purchases approximately 1700 cars in the Pittsburgh area each year. But this is no grounds for allowing price fixing, a per se violation of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1939).

It is true that there is no direct evidence of any express agreement between

Ford Motor Company and Hertz and/or Avis to determine the prices at which these fleet dealers would purchase new Ford automobiles, but again this is something which the jury was entitled to infer from the circumstances. American Tobacco Co. v. United States, supra. In view of the uniform testimony as to the formula adopted by Ford for sales to Hertz and Avis and in view of there being no refutation of it, it is difficult to see how the jury could arrive at any other conclusion.

■ Price fixing may be horizontal in nature, i. e., among competing sellers on the same level, or vertical in nature, i. e., between a manufacturer and purchaser of his products. See U. S. v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Knuth v. Erie-Crawford Dairy Cooperative Assn., 463 F.2d 470 (3d Cir. 1972). In Knuth the court said, "Next there is no evidence that the Cooperative attempted to impose upon any handler or that any handler agreed to any vertical arrangement respecting resale milk prices." In the case at bar there is ample evidence to the effect that Ford imposed these price arrangements for sales to Hertz and Avis upon its dealers. The jury was told (Tr. 5,008) that if they found a combination to fix prices then there need be no question of unreasonableness to be considered. The jury was also told (p. 5101) that if there was a per se violation, then motives and business reasons were immaterial and they were properly allowed to consider special prices to fleets as antitrust violations. This disposes of reasons 23(f) and 23(g) of reasons for new trial. It was however left to the jury at Tr. 5119 to determine whether there had been a fixing of prices under the evidence in this case. The foregoing discussion also disposes of reason 23(n) of reasons for new trial. It will further be noted that no exception was taken to these instructions.

■■ The foregoing holdings and rulings are in accord with the court decisions on the subject. Fixing maximum

prices is as much a violation of the antitrust laws as fixing minimum prices. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Kiefer-Stewart v. Joseph E. Seagram & Sons, Inc., supra. Price fixing is unlawful per se under the Sherman Act except as allowed by the Miller-Tydings Amendments. United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). As to advertising allowances, see P. Lorillard Co. v. FTC, 267 F.2d 439 (3d Cir. 1959). There is a violation where all parties are constrained to sell at a suggested price. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). See also, Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); United States v. Ward Baking Co., 376 U.S. 327, 84 S.Ct. 763, 11 L.Ed.2d 743 (1964).

In White Motor Company v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) the court said, "Price-fixing arrangements both vertical and horizontal have also been held to be per se violations of the antitrust laws and a trial to show their nature, extent and degree is no longer necessary." This case also involved sales to fleet accounts as well as to Federal, State and local governmental units and agreements covering the prices of parts and accessories to these customers. An injunction restraining price fixing was affirmed but the portion of the case dealing with legality of territorial and customer restrictions was held to be a matter to be determined after trial and the case was remanded for that purpose.

The damages resulting from this antitrust violation were not very large. Dr. Staelin, using plaintiffs' exhibit 218 showing 450 such sales by plaintiffs, computed an average damage figure per car of $76.00. See Tr. 2953, 2954, 2961. This gave a total damage estimate of $34,200.

Before leaving Sherman Section 1, we will at this point refer to two reasons for new trial which raise questions in-

volving the Robinson-Patman Act. In reason 23(b), the complaint is that the court erred in instructing the jury with respect to the Robinson-Patman Act and price discrimination. The court at Tr. 5,008 told the jury that there was no cause of action for price discrimination under the Robinson-Patman Act and that they could not find for the plaintiff on any such cause of action. See also Tr. 5,067 and 5,087 and 5,092. In view of the fact that there had been references to this act throughout the trial, the court felt that the jury should be informed what was prohibited by this act and why they could not find for the plaintiff on this score. Further, in reason 23(r) complaint is made that the jury's attention was called to the Clayton Act. The jury was told that they should consider the totality of Ford's conduct in determining whether there were violations of the Sherman Act. They were, however, told that it was extremely doubtful that there was any cause of action for violation of the Clayton Act with respect to exclusive dealing since there was little evidence of any effect upon competition. The jury apparently heeded this admonition and in their answer to interrogatory 8 stated that they found no violation of Section 3 of the Clayton Act.

No exception was taken to these instructions and we find no grounds for new trial, or Judgment NOV.

## IV. *Sherman Act Section 2; Monopolization and Attempt to Monopolize.*

At the close of the trial, the court held that there was no evidence of monopolization under the first clause of Section 2 of the Sherman Act.[8] A verdict was therefore directed for defendant on this branch of the case. The basis for this holding was that there was no evidence that Ford Motor had ever succeeded in establishing a monopoly on the sale

of automobiles (having only 25% of the market) or even anything approaching a monopoly on the sale of its own cars. There were shown to be 164 Ford dealers in the relevant geographical area in 1964 and 142 dealers in 1972. (Deft's Exhibit 202) Therefore, giving Ford credit for operation of all possible factory stores and dealer development stores in the area, these never approached 50% let alone a monopoly of Ford Dealerships.

■ The court did, however, permit the question of *attempt* to monopolize go to the jury which found the defendant guilty of such attempt. This finding was amply supported by the testimony in the case. Much of the evidence with respect to Sherman Act Section 1 was of course relevant to the problems arising with respect to Sherman Act Section 2 and there was sufficient evidence of specific intent to attempt to monopolize in the statements attributed to Messrs. Callas, Barclay and Iacocca heretofore discussed, which indicated intent to dominate the markets in the twenty major metropolitan marketing areas in the country including Pittsburgh.

■ It is a violation of Sherman 2 and a prohibited attempt to monopolize for a person or a group of persons to conspire or combine to secure a dominant share of a market through restraint of trade or predatory practices. It is not necessary that the plaintiffs show that monopolization was actually achieved. It is sufficient if there was an attempt to monopolize or a combination or conspiracy to monopolize any part of trade or commerce. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

The best exposition of an attempt to monopolize in the new car business is found in the decision of this court in Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa.1968) aff'd 417 F.2d 622 (3d Cir. 1969).

8. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ."

"Turning to the charges under Section 2 of the Sherman Act, it must be noted that that Section specifies not one but three offenses. The section provides 'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor' (15 U.S.C. 2). Monopolization, attempt to monopolize, and conspiracy to monopolize are separate offenses.

"Monopolizing is judicially defined as acquiring or maintaining dominant market control, with the power to raise or fix prices at a non-competitive level or to exclude or eliminate competitors from the market. (Citations omitted.)

"There is considerable discussion in the cases regarding the 'relevant market' in situations involving Section 2. To begin with the section itself speaks of monopolizing 'any part of the trade or commerce among the several States, or with foreign nations'. It has long been held that 'The commerce referred to by the words 'any part' construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce.' Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 61 [, 31 S.Ct. 502, 55 L.Ed. 619] (1911). Thus trade in a particular geographical area or in a particular article of commerce is sufficiently identifiable as a 'part' capable of being restrained or monopolized.

"Thus commerce in Dodge automobiles at the retail level in Allegheny County is a sufficiently identifiable 'part' of interstate commerce to be susceptible of restraint or monopolization. United States v. Klearflax Linen Looms, 63 F.Supp. 32, 39 (D.Minn. 1945). The Klearflax case illustrates the distinction between the natural and inevitable monopoly of any manufacturer over its own goods at the manufacturing level and the monopolizing of the business of retail selling of such goods on the retail level. The case also indicates that an unlawful restraint may exist with respect to a particular type of product indeed the product produced by a single manufacturer.

"United States v. General Motors Corp. (1940–1943 Trade Cases Para. 56,139), 121 F.2d 376, 400 (C.A.7, 1941) contains another clear elucidation of the distinction between the trade and commerce of the manufacturer at the manufacturing level and that of the dealers in General Motors automobiles at the retail level, and holds that the latter is susceptible of illegal restraint by the manufacturer.

\* \* \* \* \* \*

"The essence of monopoly being power to control prices and exclude competition, Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (C.A.9, 1964), there may exist situations in which such power cannot be effectively established if fungible substitute products are available in the market. United States v. Du Pont de Nemours & Co., 351 U.S. 377, 392–395 [, 76 S.Ct. 994, 100 L.Ed. 1264] (1956). This would seem to be the situation in the case at bar.

"Product differentiation through advertising, styling, and other features is common in the automobile industry. There has been testimony in the case indicating that much of the business of a dealership consists in selling new cars of the same make to loyal customers. It is common knowledge, however, that there is a limit to the brand loyalty of automobile purchasers.

\* \* \* \* \* \*

"Thus it seems clear that no effective price control by Chrysler or exclusion of competition, amounting to monopolization, could be effective in the Allegheny County market in face

of the competition of General Motors, Ford, and other manufacturers. The brand loyalty of Dodge owners would undoubtedly dissipate in the face of price increases to a monopolistic level. No successful monopolizing of the Allegheny County market for Dodges could be achieved without collusive or coercive arrangements to render ineffective the competition of other makes and no evidence of any such arrangements is in the record in the case at bar. We therefore must grant the motion for directed verdict with respect to the charge of monopolizing, under Section 2." 283 F.Supp. at 460–461.

The court discussed attempt and conspiracy to monopolize as follows:

"With respect to the second offense under Section 2, attempt to monopolize, the situation is different. Here 'The acts of attempted monopolization condemned by Section 2 of the Sherman Act are those performed with the specific intent to unlawfully monopolize, but falling short of the goal.' United States v. Charles Pfizer & Co., 245 F.Supp. 737, 739 (E.D.N.Y.1965). As there said: 'The gravamen of attempt is the specific intent to commit an illegal act, but falling short of completion.'

" 'Because the antitrust laws strike equally at nascent and accomplished restraints of trade, monopolistic design as well as results are reached by the prohibitions of the Sherman Act.' Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 622–623 [, 73 S.Ct. 872, 888, 97 L.Ed. 1277] (1953).

"An attempt is, as the term indicates, a conative effort to achieve a result. The mere failure to succeed, or the impossibility of success, does not negative an attempt. When the Memorial Day races are held in Indianapolis, there is only one victor, but all the entrants attempt to win.

"The mental or volitional element is significant in the case of an attempt.

Specific intent is necessary ingredient of an attempt when the acts performed fall short of the results condemned by the Act. (Citations omitted.)

"Likewise with respect to the third offense under Section 2 of the Sherman Act conspiracy to monopolize intent as evinced in concerted action rather than possibility of success is the crucial factor. For this offense the existence of a conspiracy is essential; whereas the cognate offenses of monopolizing or attempting to monopolize can be performed unilaterally by a single party. 283 F.Supp. at 461–462."

 When the gloss of years of judicial decisions is stripped from Section 2 of the Sherman Act, we must again consider words as they were originally enacted: "Every person who shall—*attempt to monopolize* or combine or conspire with any other person or persons to monopolize *any part of the trade*—". In view of the fact that Ford as a member of an oligopoly possesses 25% of the market for new automobiles in this country, it would seem that an attempt by Ford to monopolize the sale of its new cars through subsidiaries operating as factory and dealer development stores in major metropolitan communities to dominate the markets in these communities to the injury of and in competition with its independent dealers should be considered an attempt to monopolize this part of the market for new automobiles. When it combines or conspires with its wholly owned subsidiaries it is likewise guilty of a conspiracy to monopolize this part of the trade among the several states.

Ford is the only source of Ford and Lincoln-Mercury motor vehicles. A Ford or Lincoln-Mercury dealer must, under the terms of his franchise, fulfill his fair share of the market penetration expected in his area by the manufacturer. He has no place else to go to secure new vehicles for sale. He cannot turn to another of the big three American manu-

facturers. His investment in facilities and goodwill, if it is to be productive, must be tied in with sales of Ford vehicles. It would therefore seem that the sale of Ford cars is an important submarket of the market for sales of new cars. The evidence shows that owner loyalty to Ford products is as high as 90%. Hence, it would seem that to apply the fungible product theory, i. e., that every new car is the same as another, is completely unrealistic. See e. g. United States v. Guerlain, Inc., 155 F.Supp. 77 (S.D.N.Y.1957) involving the appeal of a perfume with a highly exploited trademark.

We realize that the courts are badly split with respect to this problem. Some courts blindly follow the decision of the United States Supreme Court in the Cellophane Case, United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) without examining the basis for this decision and without ascertaining what may be dicta in the opinion. This was a case involving actual monopolization, not an attempt to monopolize, and the court unquestionably held that for a manufacturer to obtain a monopoly of the sale of its own product is not a violation of Sherman Act Section 2 where there are other commodities "reasonably interchangeable by consumers with the manufacturer's own product". This may be true of a plastic packaging material such as Cellophane but not necessarily true of a product such as an automobile manufactured under a highly exploited and widely advertised trademark and to which there is, as shown, a high percentage of owner loyalty.

We recognize that many cases do apply the DuPont case to attempts to monopolize and hold that the relevant product market cannot consist solely of the products of one manufacturer unless of course they are unique. See, e. g., Cal Distributing Co. v. Bay Distributors, Inc., 337 F.Supp. 1154 (M.D.Fla.1971) (wines); A–1 Business Machine Co. v. Underwood Corp., 216 F.Supp. 36 (E.D.Pa.1963) (business machines); and the

motor vehicle cases Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S. App.D.C. 161, 243 F.2d 418 (1957); Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D.Ill.1966); Johnny Mattox Motor Co. v. Ford Motor Co., 202 F.Supp. 103 (W.D.Tex.1960).

There are also cases holding that in attempts to monopolize cases the evidence must show a dangerous probability of success. In the instant case, the court did not charge on the dangerous probability of success but, on the other hand, no exception was taken to this failure at the close of the court's charge which would clearly be required if defendant is going to claim error as a result of such omission. See Morely v. Branca, 456 F.2d 1252 (3d Cir. 1972) and Federal Rule Civil Procedure 51.

In other words, it appears to be defendant's contention that to have a case where plaintiff can recover on an attempt to monopolize you must have (1) specific intent, (2) a relevant product market not limited to the automobiles of one manufacturer and (3) a dangerous probability of success. Since defendant claims that elements 2 and 3 are missing here, there can be no recovery under Sherman Section 2.

We believe that the better line of case is in accordance with the reasoning in Mt. Lebanon Motors, supra, and it is best expressed by the Ninth Circuit in Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964). That case clearly holds that the relevant market is not an issue in an attempt to monopolize case and that probability of monopolization is not essential to an attempt to monopolize. The court holds only specific intent to monopolize is required and points out that the "actor is better able than others to judge the practical possibility of achieving his illegal objective" than anyone else and that the fact he intends to monopolize is therefore enough.

Lessig, supra, relies upon Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561

(10th Cir. 1961) and particularly United States v. Consolidated Laundries, 291 F. 2d 563 (2d Cir. 1961) which only require that there be an appreciable part of the market involved as there is in our case.

A good exposition of the problems involved in this area is found in the recent cases of Woods Exploration Co. v. Aluminum Co., 438 F.2d 1286 (5th Cir. 1971) and in Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1970). See also Article by Professor Donald F. Turner, 70 Harv.L.R. 281.

Regardless, however, of whether the court erred in instructing the jury with respect to relevant product market and also erred in not instructing on dangerous probability despite no exception and whether there was sufficient evidence of relevant product market as consisting of new Ford vehicles and dangerous probability, this should not affect the outcome of the case. There was ample evidence to support the jury's findings of violation of Sherman Section 1. The jury's answers to interrogatories found violations of both Sherman 1 and Sherman 2 and the jury was instructed that if they found violation of either or both of these sections, they could award damages to plaintiff. The award of damages therefore should stand.

We should at this point discuss certain other reasons for new trial advanced by defendant. Claim is made in reason 23(bb) of the instruction of the court (Tr. 5114) that the jury was told that they should consider the picture as a whole and not break the evidence down into separate compartments.

The United States Supreme Court has clearly stated that the evidence must not be fragmentized or compartmentalized whereby you stop after each segment of evidence and determine whether it constitutes an antitrust violation in itself and then wipe the slate clean after scrutiny of each segment. The court has held the jury should look at the whole picture. Continental Ore Co. v. Union Carbide Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Lessig v. Tidewater Oil Co., supra. As a matter of fact, many of defendant's arguments must fail because of inability or unwillingness to recognize this principle.

The defendant also complains in reason 23(f) of the court's instructions that motives were immaterial if the jury found violation of the antitrust laws. (Tr. 5101). This is in accordance with United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) and would not constitute error.

V. *Damages*

We have previously discussed the matter of damages resulting from breach of contract determined by the jury to be $29,683 and the damages resulting from violation of the Automobile Dealers Act assessed at $350,000 which we have previously sustained. We have also confirmed that portion of the damages for violation of the antitrust laws generally resulting from price arrangements with respect to fleet sales in the amount of $34,200 which was included in the figure of $1,750,000 which the jury awarded in their answer to interrogatory 9 for the total violations of the antitrust laws. Defendants claim that the total amount was excessive, that the evidence of the witness Dr. Staelin to support the figure was improperly admitted and that the evidence of damages was speculative, vague and conjectural.

Complaint is also made in reason for new trial 23(t) that the court should not have charged the jury with respect to treble damages. The court told the jury (Tr. 5089, 5090 and 5121) that it was to find only the amount of the actual damage. The language from Section 4 of the Clayton Act (15 U.S.C. § 15) wherein it is provided that the plaintiff who is injured by a violation of the antitrust laws shall recover threefold of the amount of damages sustained was read and the jury was told that this trebling was a matter for the court after

they had determined the amount of the actual damage. In view of the fact that these cases are often referred to as treble-damage antitrust suits, it was proper that the jury should be told this or otherwise they would feel they were the ones to treble the damages which would result in a much larger verdict against the defendant than was proper. This form of instruction is set forth in Devitt & Blackmar Federal Jury Practice and Instructions, Section 85.28. A new trial on this ground will be denied.

■■■ Defendant further complains (reason for new trial 23(cc) that the court erred in reading to the jury a quotation (Tr. 5116) from Bigelow Theatres v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).[9]

To the same effect is the decision in Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) where it was stated that it was enough if the illegality is shown to be a material cause of the injury and that plaintiff need not exhaust all possible alternative sources of injury. In that case the damages were calculated by showing what should have been plaintiff's share of the market. "Damage issues in these cases are rarely susceptible of the kind of concrete detailed proof of injury which is available in other contexts". (pg. 123, 89 S.Ct. pg. 1576) Incidentally, in this case the court held that a court is entitled to assume the continuance of a conspiracy in restraint of trade in the absence of clear evidence of its termination. This case also points out the deference which should be given to decisions of the triers of the fact who are usually in a superior position to appraise and weigh the evidence. In this case this deference will be accorded to the verdict of the jury.

■ Defendant however claims that the quotation from Bigelow labeled defendant Ford Motor Company as a "wrongdoer". It is difficult to see how the jury could be misled as to this. They were cautioned that they were not to go to the question of damages until after they had determined that there had been a violation of the antitrust laws. All of the court's remarks were carefully hedged with the words: "if you find", "what plaintiff claims is misconduct", "if you find such violations". It will further be noted that no exception was taken to this portion of the charge. See Morley v. Branca, 456 F.2d 1252 (3d Cir. 1972). At Tr. 5117, et seq., the court discussed the testimony of all three experts: Staelin, Cyert and Geisel and at 5119 discussed the defendant's testimony as to the question of damages, the defendant claiming that no loss had been suffered. We find no error here.

■ The defendant further claims that plaintiff, 22 Ford, Inc., failed to show that it lost money as the result of the antitrust misconduct of the defendant. The jury was told at 5115 and 5116 that the fact that 22 Ford had

9. "In such a case, *even where the defendant by his own wrong has prevented a more precise computation*, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In circumstances juries are allowed to act on probable and inferential as well as upon direct and positive proof. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery. The most elementary conceptions of justice in public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principal is an ancient one and it is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application. The wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable."

880

some profits did not prevent recovery. It was entitled to recover what it would have made but for violation of the antitrust laws by the defendant, if the jury found that such violations were the proximate cause of such losses.

■ It seems clear that plaintiff in an antitrust case need not have been driven to the wall or forced into bankruptcy before a suit can be brought for violation of the antitrust laws and damages suffered thereby. See Bigelow Theaters v. RKO Radio Pictures, supra, and Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967).

■ Defendant further claimed that the plaintiff cannot recover for damages occurring after filing the complaint on March 6, 1967, and for this purpose cites Allen Ready Mix Concrete Co. v. John A. Denie Sons Co., 1972 Trade Cases 92008 (W.D.Tenn.1972). The court there clearly recognized that damages may be recovered beyond the date of the filing of the complaint when such damages resulted from the original illegal acts which were the subject of the complaint. In our case, it has been clearly shown that the effects of the antitrust violations as found by the jury would and did continue for some period of time following the filing of the complaint. Plaintiff did not seek any damages for any date beyond the date of trial and with respect to the fleet leasing sales only claimed damages up to the time that he ceased to participate in the program in 1970.

It is also claimed that plaintiff, 22 Ford, cannot show that it lost the sale of one car. If plaintiff had produced a customer who was enticed to a factory store, then of course defendant would say that he had only shown the loss of one customer. Early in the case, it was determined that the relevant geographic market was the area covered by the Pittsburgh Sales Office of Ford Motor Company which included several counties in southwestern Pennsylvania and parts of adjacent Ohio, West Virginia and Maryland. The evidence showed however that generally plaintiff's sales were confined to the Allegheny County area. Plaintiff's place of business in Monroeville, Allegheny County was within a few miles of Triangle Ford on Baum Boulevard in Pittsburgh. In this day of mobility, it is reasonable to expect that customers would travel from one Ford Dealer to another in the Allegheny County area to select a new car, particularly where they might be attracted by massive advertising and agressive tactics of numerous salesmen. In the light of this, it is vain for defendant to say that plaintiff was not in the target area of Triangle Ford. Triangle Ford was not the only company owned store in Allegheny County but there were others and also dealer development stores and in such circumstances under Bigelow and Zenith, plaintiff had to do the best it could in its proof.

The evidence of Dr. Staelin, plaintiff's expert, as supported by his report (Plaintiffs' Exhibit 241) was that plaintiff, a private dealer, was economically hurt by the fact that the factory stores were subsidized by the defendant in large amounts for advertising promotions and a large number of salesmen. He gave the jury three estimates of damage: (1) considering subsidy to company owned stores alone, the damages amounted to $1,110,000. (2) If subsidies to Lincoln-Mercury Division, which it was testified were competitive with 22 Ford, were used, then the estimated figure would be $2,531,000 or, on the other hand, (3) offering the greatest discount to either Ford or Lincoln-Mercury in each year a figure of $3,043,000 would be arrived at.

There was still another method to be used by taking the gross profit of 22 Ford on each vehicle sold of $318 and considering the profits which would have been made had the company stores not made their sales, the jury could then arrive at a figure of $2,544,000. The jury rejected all these methods and came up instead with a figure of $1,750,000.

In its reasons for new trial, the defendant has various complaints about this testimony and in reason 24(b) the

claim is made that certain matters were not included in the scope of the expert's report as required by the pretrial rules of the Western District. The court examined the reports, however, and determined that the testimony was clearly within the scope thereof and that defendant was fairly apprised of the nature of Dr. Staelin's testimony. As a matter of fact, defendants were able to produce two experts of their own to refute Dr. Staelin's theories but the trouble was the jury did not accept their testimony.

In reason for new trial No. 23 (m), defendant complained of the admission into evidence of plaintiffs' Exhibit 241 being Dr. Staelin's calculation of damages. It is true that Dr. Staelin admitted there were some mathematical errors in Exhibit 241, however, it appears that these were minor and certainly did not affect the jury since they reduced the amount of damages drastically from the highest figure given by him. We therefore find no error in admitting this exhibit.

In reason for new trial 23(u) the defendant likewise complains of error in sending this exhibit out to the jury for their deliberations. Complaint is also made that the exhibit contains damages accruing after the filing of the complaint. We have heretofore pointed out that plaintiff was entitled to such damages under the evidence in this case, at least up until the time that Ford's activities with respect to company stores and dealer development stores ceased in the Pittsburgh area. In this respect, the evidence indicated that some of these stores were still operating at the time of trial. No damages were allowed beyond the date of trial and hence we do not reach this problem.

Exhibit 241 actually was no more than a tabulation of plaintiffs' claim. In a complicated case such as this, it was proper for the jury to have such tabulation with them to assist them in their deliberations. It is customary in personal injury and other cases to send out a tabulation of the plaintiff's claim to the jury so that they will be able to consider all the various figures involved and this has been held proper. Shane v. Warner Mfg. Corp., 229 F.2d 207 (3d Cir. 1956). The jury was cautioned that they need not accept any of the figures on the tabulation. We find no error in this respect.

There is, however, an important matter in the calculations by Dr. Staelin that must be considered. Mr. Schroll testified that he had been told that Ford had a profit at the factory of $500 to $600 per car (Tr. 1145) and Staelin assumed this was true.. We also had portions of letters submitted by Ford to a Senate Committee (Pltfs' Exhibit 139) where it was shown that the gross profit at an assembly plant was around $600 per car. The weight of the testimony indicates that this was not the net profit per car. It was pointed out that from this figure you had to deduct amounts for general overhead and home office expense. Witness Stedem testified (Tr. 2746, Deft's Ex. 291 pp. 2765 and 2766) that when you took this out the actual profit per car was $371. This would be the figure with which Ford had to work in determining how much subsidy they put in company stores in furtherance of their project of maximizing profits by subsidizing losses. See Tr. 5110. It therefore appears that the figure upon which a subsidy could be based was overstated and that a truer figure would be approximately 62% of that used. Some of Dr. Staelin's figures were based upon a formula using the greatest discount of either Ford or Lincoln-Mercury in each given year and thereby he came up with a figure of $3,043,000. On the other hand, the jury also had plaintiffs' Exhibit 239 which showed a compilation of all the factory stores in the Pittsburgh sales area which were engaged in business for certain periods of time during the period 1964 to date of trial. This showed average losses per new unit sold by fleet and

retail sales by each factory owned Ford or Lincoln-Mercury outlet in the area and the composite was $121.05 per vehicle over this period. Applying plaintiffs' theory that it is entitled to recover as damages this subsidy which was given by Ford to other factory stores and dealer development dealers, and which was denied plaintiffs it would seem that this is closer to the true amount of damages per car. As a more realistic figure as to how much 22 Ford with total sales of 7287 units, 1964–1972 (Pltfs' Ex. 238) was damaged by failure to receive subsidies or discounts equivalent to those received by factory stores, we would arrive at a total actual damage for antitrust violations exclusive of fleet sales of $969,-247.35. Adding the $34,200 damages from participation in fleet sales which is firmly supported, we arrive at a figure of approximately $1,000,000 as actual damages. This is also approximately the figure at which we would arrive if we allowed for the overstatement of the profit per car at the manufacturing plants of Ford Motor Company.

In paragraph 22 of defendant's combined motions for Judgment NOV or in the alternative for a new trial, it is claimed that the verdict is excessive. We agree that the amount of damages awarded for violation of the antitrust laws Sherman Act Sections 1 and 2 is excessive to the extent indicated, i. e., by the sum of $750,000. We will direct that a new trial be awarded unless plaintiffs file a remittitur of this amount of actual damage for violation of the antitrust laws within 20 days from the date of this order. If such remittitur is filed, we will then amend the judgment trebling the damages under the antitrust laws accordingly.

## VI. *Miscellaneous Reasons for New Trial.*

The previous discussion covers most of the 45 reasons for a new trial advanced by the defendant. Three of the remaining ones do deserve some mention:

■ (1) *Calling certain representatives of Ford as on cross examination by the plaintiff.* The plaintiff called as on cross under Rule 43(b)[10] certain persons who were not officers or directors of Ford Motor Company but the court did rule that they qualified as "managing agents". The persons called were all persons in some position of authority for the defendant Ford Motor Company in charge of certain phases of the business at least in the Pittsburgh area.

■ The best discussion of what is a managing agent who may be called for cross examination is contained in Skogen v. Dow Chemical Co., 375 F.2d 692 (8th Cir. 1967). We are taught by the decision in that case not to be too technical or literal in our approach to determinations under this Rule and the Rule should be applied liberally to reach the demands of justice. Technicians and scientists may be called where they are the only persons with knowledge of the subject matter. The question is whether the witness' interests are identified with those of his principal and whether they act with superior authority with reference to the subject matter in a litigation. Applying these rules, we see no error.

■ (2) *Admission of testimony as to Automatic Radio.* Certain testimony crept into the case with reference to the installation of radios in new Ford cars. It appeared that Ford tried to induce

10. "A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, *or managing agent* of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."

dealers to use Motorola car radios which were manufactured by a Ford subsidiary. The dealer, 22 Ford, desired to use radios which were manufactured by another manufacturer, Automatic Radio. Eventually, Ford changed the dashboard of new Ford automobiles so as to make it virtually impossible to install Automatic Radios or any radio other than Motorola. When this testimony began to come in, it appeared that it was going to lead to something concerning an illegal tying arrangement or exclusive dealing or something of that nature. As the testimony developed however it appeared that the plaintiff could not show how this affected its operations and to what extent it might have been damaged by any such conduct. We therefore ordered the testimony stricken and instructed the jury to disregard it. It is the opinion of the court that the admonition to the jury (Tr. 3318) was sufficient to cure this admission of evidence which the plaintiff was unable to follow up.

(3) *Refusal to Allow Witnesses to Testify as to Conversations with Mr. Callas, deceased.* Callas was one of the officials of Ford Motor Company whose statements were quoted along with those of Mr. Barclay and Iacocca relative to the intention of Ford to dominate the market in 20 metropolitan centers. This testimony was referred to in the court's charge at 5101–5109. Defendant in its case attempted to introduce evidence of certain people as to conversation they had had with Callas at luncheons and elsewhere indicating a different approach to the attempt to dominate markets by company owned stores. The court sustained objections to this. It is difficult to see that this falls within any exception to a hearsay rule. See Corpus Juris Secundum, Vol. 31(a) Evidence, Section 205 and a host of cases cited therein in Note 77. It is claimed however that such testimony should be used for the purpose of attacking the credibility of Mr. Schroll who testified to these statements by Callas. We do not understand how statements by Callas at some luncheon indicating that he favored

independent private dealers would in any way combat Schroll's credibility as to Callas' statements made at certain public meetings. If the defendant had someone who heard Schroll say that he never heard Callas make these statements or if the defendant had someone who was present at these meetings and stated definitely that Callas did not make such statements, we would certainly have admitted the evidence. Otherwise, we cannot understand how the fact that Callas may have been heard to make some inconsistent statements at some other time and place necessarily proves that he did not make the ones attributed to him by Schroll. See also Donsavage Estate, 420 Pa. 587, 218 A.2d 112 (1966).

We have examined the other reasons filed by defendant for new trial and find them all to be without merit, and therefore do not add to this already over long discussion in order to deal with them specifically.

## VII. *Motion to Amend Judgment.*

Defendant also complains of the manner in which the judgments were entered in this case. The first complaint is that Edward C. Rea has no standing to claim the damages for breach of the oral contract for sale of real estate as embodied in the first cause of action. We have already dealt with this and this motion will be denied. Secondly, it is claimed that any damages for violation of the antitrust laws belong solely to 22 Ford, Inc. and not to Edward C. Rea. This contention is correct and any judgment in favor of Edward C. Rea for violation of the antitrust laws will be amended accordingly. Third, defendant contends that judgment should be entered in its favor with respect to the third cause of action, i. e., violation of the Robinson-Patman Act. At the trial, the court directed the jury that no such cause of action had been made out and we will therefore amend the judgment accordingly to direct that judgment be entered in defendant's favor with respect to the third cause of action. Fourth, the defendant contends that judgment

884

should be entered in its favor with respect to the sixth cause of action in which there was a claim for violation of Section 3 of the Clayton Act and also the provisions of the Act of July 2, 1890, (Sherman Act). The jury in answer to interrogatory 8 did find that there was no violation of Section 3 of the Clayton Act. The other allegations in the sixth cause of action we have held are more properly a violation of the Automobile Dealers Act and were included therein. We will therefore direct that judgment be entered in favor of the defendant with respect to the sixth cause of action; insofar as violation of Section 3 of the Clayton Act and the Sherman Act are alleged, but not with respect to these allegations insofar as the same may be considered a violation of the Automobile Dealers Act.

In addition, defendant demands that it be allowed its costs with respect to said causes of action. This appears to be a matter of determination of costs which is not presently before us.

An approriate order will be entered.

## ORDER

And now, to wit, December 26, 1972, upon consideration of defendant's motions for judgment in accordance with its motions for directed verdict or in the alternative for a new trial and after carefully considering the briefs and arguments of the parties,

It is ordered that defendant's motions for judgment in accordance with the motions for directed verdict be and the same hereby are denied.

It is further ordered that the partial summary judgment entered May 5, 1971, with respect to the second and seventh causes of action be confirmed and summary judgment is entered for the defendant with respect to said causes of action.

It is further ordered that the motion for a new trial be denied except to the extent, in accordance with the foregoing opinion, it has been determined that the damages in this case are excessive. As to this contention, it is ordered that the motion for new trial be granted unless plaintiff shall filed a remittitur within 20 days from the date of this order remitting all actual damages for violation of the antitrust laws in excess of $1,000,-000 in which case the judgment for treble damages will be amended accordingly.

It is further ordered that defendant's motion to amend the judgment be denied except to the extent that the same is ordered to be granted in the foregoing opinion and as to such amendments a separate order will be entered.

## ORDER AMENDING JUDGMENT

And now, to wit, December 26, 1972, it is ordered that the judgment heretofore entered on May 30, 1972, be amended as follows:

The last paragraph of the order directing entry of judgment on the special verdict for the plaintiffs in this case entered May 27, 1972, shall be modified to read as follows:

"And the jury having returned a verdict for plaintiffs by reason of violations of the antitrust laws of the United States in the sum of $1,750,000, it is therefore ordered that judgment of threefold said amount, to wit: in the sum of $5,250,000, be and it is hereby entered in favor of 22 Ford, Inc., plaintiff and against Ford Motor Co., defendant . . . ."

It is further ordered that judgment be entered in favor of the defendant with respect to the third cause of action set forth in the complaint.

It is further ordered that judgment be entered in favor of the defendant with respect to the sixth cause of action set forth in the complaint insofar as violation of Section 3 of the Clayton Act and the Sherman Act are alleged.

In all other respects, the order of May 27, 1972, entered May 30, 1972, is confirmed.

## APPENDIX I

### SPECIAL VERDICT

In accordance with instructions of the court, the jury hereby finds as follows:

(1) Was there a binding contract between plaintiff, Edward C. Rea, and defendant, Ford Motor Company, whereby Rea would acquire the title to so-called Balison tract of land in Monroeville, Allegheny County, Pennsylvania?

ANSWER: "YES"

(2) If your answer to the first question is "yes", what were the terms of the contract?

(a) that Rea was to take title in his own name or in the name of a corporation formed by him and lease the same to defendant, Ford Motor Company, for a term of years with a lease-back from Ford Motor Company to 22 Ford, Inc., Rea's Dealership? (The so-called *direct-lease plan*)

ANSWER: "YES"

(3) Do you find that the defendant, Ford Motor Company, breached its agreement as found by you in your answers to Questions 1 and 2?

ANSWER: "YES"

(4) If your answer to Number 3 is "yes", what amount of damages do you award Edward C. Rea for such breach of contract?

ANSWER: "$29,683.00"

(5) Did the defendant breach its duty to act in good faith in performance or in complying with any of the terms of the franchise or sales agreement between 22 Ford, Inc. and Ford Motor Company as required by the Automobile Dealers Act?

ANSWER: "YES"

If your answer is "yes", what amount of damages do you award plaintiff, 22 Ford, Inc., for this breach of duty?

ANSWER: "$350,000.00"

(6) Did defendant enter into any contract, combination or conspiracy which was in effect during the period since February 11, 1964, and which unreasonably restrained interstate trade or commerce in Ford motor vehicles at the retail level in the area covered by the Pittsburgh Sales Office of Ford Motor Company?

ANSWER: "YES"

(7) Did the defendant during the period from February 11, 1964, attempt to monopolize interstate trade or commerce in Ford motor vehicles at the retail level in the area covered by the Pittsburgh Sales Office of Ford Motor Company?

ANSWER: "YES"

(8) Did the defendant violate Section 3 of the Clayton Act making it unlawful to make a sale or contract for sale of goods or commodities on condition that the purchaser shall not use or deal in goods and commodities of a competitor, viz: Oldsmobile automobiles manufactured by General Motors Corporation where the effect was substantially to lessen competition or tend to create a monopoly in any line of commerce?

ANSWER: "NO"

(9) If your answer to either 6, 7 or 8 or any of them is "Yes" what damages did plaintiffs sustain by reason of any such violation of the antitrust laws?

ANSWER: "$1,750,000.00"

(Signed by the Jury)

## APPENDIX II

Automobile Dealers Franchise Act, 15 U.S.C. § 1221 et seq.

Section 1221:

"(b) The term "franchise" shall mean the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract.

(e) The term "good faith" shall mean the duty of each party to any

franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith. Aug. 8, 1956, c. 1038, Sec. 1, 70 Stat. 1125."

Section 1222:

*"Authorization of suits against manufacturers; amount of recovery; defenses*

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* that in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith. Aug. 8, 1956, c. 1038, Sec. 2, 70 Stat. 1125."

Section 1223:

*"Limitations*

Any action brought pursuant to this chapter shall be forever barred unless commenced within three years after the cause of action shall have accrued. Aug. 8, 1956, c. 1038, Sec. 3, 70 Stat. 1125."